THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FERNANDO ZAYAS, Defendant-Appellant.

First District (5th Division)   No. 84—1400

Opinion filed June 26, 1987.—Rehearing denied July 21, 1987.

Sam Adam and John DeLeon, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

On appeal from his jury trial conviction on three counts of murder, defendant Fernando Zayas seeks a new trial based on the following contentions: (1) the jurors were improperly questioned concerning their views on the death penalty; (2) the State improperly utilized its peremptory challenges to exclude one Hispanic and 14 out of 15 blacks from the jury; (3) in opening argument the State alluded to damaging evidence which was never established at trial; (4) the trial court erroneously precluded the defendant from presenting certain exculpatory evidence; (5) the defendant was precluded from impeaching a State witness with his prior record of supervision; (6) the State was permitted to introduce hypnotically enhanced testimony; (7) gruesome photographs were unnecessarily shown to the jury; and (8) a cautionary defense instruction on eyewitness identification was refused.

We affirm.

The following pertinent evidence was adduced at defendant's trial. At about 1:45 a.m. on July 2, 1983, Miguel Vargas, Luis Cuaresma, and Ruben Gutierrez were shot to death on the front porch of a two-flat building at 1438 West Catalpa in Chicago. On the premises at the time of the shooting were Carlos Vargas, Julia Tiro, and Ruby Mateo. Carlos Vargas testified at trial that he had just emerged from the apartment onto the porch to join the victims when he heard a gunshot. He saw the defendant, whom he had known for six or seven years, shooting at the victims from the bottom of the steps. Carlos heard several more shots and then returned inside, where he asked Ruby and Julia to call the police. Carlos initially told the police that he had been in the kitchen and had not seen the shooting. He also ad-

mitted that on his instructions Julia and Ruby told the police the same thing. Carlos testified that he did not initially tell the truth because he feared for his family's life. He also testified that he and Miguel Vargas were members of the Insane Unknowns street gang, whereas defendant was a member of the Disciples.

Subsequently on July 13 Carlos told the police that he had seen the defendant shooting at the victims.

Another eyewitness testifying for the State was Timothy McGovern. On the occurrence date McGovern, then 14, lived across the street and two doors to the east of the two-flat building. As he was walking home, at a point three doors from his house, he saw two men leave a car and walk toward the two-flat. When he was two doors from home he heard a gunshot and saw the defendant firing a gun toward the porch of the two-flat. After four or five shots the defendant went north through a gangway.

McGovern also testified that out of fear he did not initially tell the police about what he saw. On August 16, 1983, McGovern's brother Thomas was shot coming into the McGovern home. When two police officers came to investigate that shooting, which Timothy thought might be related to the July 2 shooting, he told them what he had seen on July 2. He subsequently identified the defendant from a book of 150 to 200 photographs and then in a lineup.

Socorro Roldan testified that in 1979 he and the defendant were members of the Latin Disciples street gang. In 1978 one of the victims in the cause, Miguel Vargas, a member of another gang, killed a Latin Disciple named Ramon "Chi Chi" Vasquez. Trial evidence established that Vargas pled guilty to the killing in a juvenile court proceeding. According to Roldan defendant had a tattoo on his arm stating "Chi Chi, rest in peace."

The evening after the shootings Roldan went to a party celebrating those killings. There the defendant told him that he, Jose Rodriguez, Ricky Garcia, and an unnamed fourth person had picked up a car belonging to Jose's sister, Juanita, without her knowing about it. They then drove to the two-flat, where defendant, Garcia and Rodriguez shot the victims, using two .38 caliber guns and a .357. Afterward they ran through the gangway to the car, which they returned to its spot at Juanita's house. A State firearms expert subsequently testified that the bullets recovered from the victims' bodies established that they were shot with .38 caliber and .357 Magnum weapons.

On July 30, 1983, Roldan was hospitalized after being shot by another member of the Latin Disciples. During the investigation of that

shooting Roldan told the police of defendant's admissions. Defendant subsequently visited Socorro at the hospital. Police officers were secreted so as to overhear the conversation. (The record indicates that the conversation was taped but the tape was of poor quality and the jury was not informed of it.) When Socorro asked about the triple murder, defendant denied any involvement, but he did say that Jose Rodriguez had been shot by Garcia during the incident. Defendant also told Socorro to be quiet because somebody was "tricking" on him, an expression Socorro understood to mean informing on him. Socorro believed that defendant denied any involvement because defendant believed Socorro was talking to the police.

At trial, over defense objection, the State also elicited testimony from Chicago police detective Michael Atkins, whose recall had been enhanced through hypnosis. Out of the jury's presence, the court first heard the testimony of the hypnotist, Dr. Bennett G. Braun. Braun testified that he was a psychiatrist, a director of the American Board of Hypnotists, and a consultant with the Cook County sheriff's department, holding the title of deputy sheriff. Braun testified extensively concerning his qualifications and the guidelines he followed in hypnotizing Atkins in an attempt to avoid problems of suggestion and confabulation (filling in memory gaps with imagined recall) associated with hypnosis. The court found Braun to be highly qualified in the field and also found the State was not required to establish that hypnosis was a field possessing a reasonable degree of scientific certainty. Detective Atkins then testified, before the jury, that at 1:45 a.m. on the morning of the shooting he and his partner drove to the shooting scene and then continued north two blocks. A light blue car with four male occupants pulled in front of them. One of the passengers kept looking back, and Atkins looked briefly at the license plate. He did not write down the number because they had been told to look for a car containing two female Latins. However, when they returned to the shooting scene, Atkins was told that a light blue two-door car might be involved. This sounded similar to the car Atkins had seen, described by him at the time as a light blue car, probably a Plymouth Sebring, license number XND 045. After being hypnotized Atkins recalled the car as being a light blue, late model two-door Pontiac, with chrome around the rear window, a red and tan sticker on the license plate, and the license number NXJ 402.

Trial evidence established that the license plate of Juanita Rodriguez' car, which defendant allegedly said was used in the shooting, was NXJ 240. Socorro Roldan had also testified that he knew Juanita's car to be a light blue, two-door vehicle.

Defendant presented an alibi defense. Angelo Ferrand, the step-father of defendant's girlfriend Lateria, testified that defendant and Lateria stayed at Ferrand's Waukegan home from June 30 until July 5. On July 1 he saw the defendant at the Waukegan home in the evening before going to bed at midnight and also saw him the next morning at 9 a.m.

Jose Aviles, a cousin of Lateria, testified that he drove defendant and Lateria up to the Waukegan house on June 30, and they stayed until about July 6. On July 1 he watched television with defendant until 1 or 2 a.m. and then saw him again at 7 a.m. the next day. Luis Allendi, Lateria's brother, also lived at the Waukegan house and testified that defendant and Lateria were there throughout the holiday weekend, including July 1 and 2.

The defense also called Juanita Rodriguez. She denied even lending her car to her brother, Jose Rodriguez, in the month of July or any other time. The evening of July 1 she had the car keys home with her. She saw her car at 6:30 p.m. when her husband drove it home from work and again when she got up in the morning at 9 a.m.

Following jury deliberations defendant was convicted of three counts of murder and was sentenced to three concurrent terms of imprisonment for natural life without parole.

OPINION

1

■ Prior to trial the State announced its intention to seek the death penalty. Defendant contends he was prejudiced when, despite his stated intention to waive his right to a jury at the death penalty stage of the proceedings, the trial court permitted the State to question the jurors concerning their views on the death penalty pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. In *Daley v. Hett* (1986), 113 Ill. 2d 75, 495 N.E.2d 513, our supreme court determined that a defendant could exercise such a pretrial waiver. However, our supreme court has subsequently determined that *Daley* does not apply retroactively, nor would the death-qualifying of a jury despite such a proper waiver prejudice a defendant. *People v. Erickson* (1987), 117 Ill. 2d 271.

2

■ Defendant, a Hispanic, also contends that the State improperly exercised its peremptory challenges to exclude 14 or 15 blacks and the sole Hispanic from the jury in violation of *Batson v. Kentucky*

(1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The State initially contends that the record does not establish how many blacks were on the jury, and it also notes that a Hispanic alternate juror was selected. In any event we find that under the express holding of *Batson* defendant lacks standing to challenge the exclusion of blacks from the jury. The *Batson* court held that to establish such a case "the defendant first must show that he is a *member of a cognizable racial group*, [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race.*" (Emphasis added.) (476 U.S. 79, 96, 90 L. Ed. 2d 69, 87, 106 S. Ct. 1712, 1723.) Although the Colorado Supreme Court recently ruled that a black defendant could challenge the exclusion of Hispanics from the jury, that court did so on the basis of a sixth amendment and Colorado constitutional right to a jury drawn from a fair cross-section of the community. (*Fields v. People* (Colo. 1987), 732 P.2d 1145.) However the United States Supreme Court has declined to extend the fair cross-section requirement to petit juries. (*Lockhart v. McCree* (1986), 476 U.S. 162, 174, 90 L. Ed. 2d 137, 148, 106 S. Ct. 1758, 1765.) Accordingly, we find that defendant lacks standing to challenge the State's partial exclusion of blacks from this jury.

■ We also find no merit to defendant's claim that the elimination of a single Hispanic from the jury necessitated a *Batson* hearing. The potential juror at issue stated during *voir dire* that she had a nephew currently in jail, a situation which she described as "very painful" to the family. She also stated the nephew persisted in associating with the same "group." Although she stated that she believed the courts were fair in his situation, we do not find that a *Batson* challenge to the State's peremptory challenge could reasonably be sustained. Accordingly, we find no basis for reversal on this ground.

### 3

■ Defendant also contends that in opening argument the State twice improperly alluded to incriminating evidence which was then not introduced at trial. In one instance the State informed the jury that defendant had vowed revenge against one of the victims, Miguel Vargas, because Vargas killed defendant's friend, Ramon "Chi Chi" Vasquez. As we have noted, at trial the State did establish that defendant told Soccoro Roldan that Vargas had killed Chi Chi and that defendant had a tattoo stating "Chi Chi, rest in peace." However the court then barred the State from eliciting from Roldan, himself a former member of the Latin Disciples, that a gang member seeking revenge for a slaying would have the slain member's name tattooed

on himself. Clearly there was no deliberate misconduct by the State on this issue, nor did this opening-argument statement substantially prejudice the defendant, given the eyewitness testimony which directly implicated him in this crime. Accordingly we find no reversible error arising from this comment. *People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181.

■■ There is no merit to the second opening-argument comment objected to by defendant. The State told the jury that, while in the hospital, Socorro Roldan was told by defendant of the involvement of his two fellow gang members but would not admit his own involvement. As our earlier summary of Roldan's testimony establishes, this statement by the State was a substantially accurate account of Roldan's testimony on this point.

## 4

■■ Defendant next contends that on several occasions the trial court improperly barred defense evidence. In the first such instance the defense was barred from introducing evidence concerning the gun used in the shooting of Timothy McGovern's brother Thomas, six weeks after the shootings at issue here. That gun was subsequently destroyed, apparently mistakenly, by the police department. Defendant contends that he should have been permitted to present these facts to the jury in order to establish a police conspiracy to destroy possibly exculpatory evidence. We find that the court properly exercised its discretion to bar the presentation of such speculative evidence. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 453 N.E.2d 849.) The subsequent testimony by a State firearms expert was that it was not very probable that any of the bullets recovered from the three victims came from the same type of weapon involved in the McGovern shooting. Under these circumstances we find no abuse of discretion in the trial court's ruling.

■■ The defendant also sought to call two witnesses who would have testified concerning possible motives by others to kill the victims. One of the witnesses, Harry Ramirez, would have testified that one or two days before the shooting one of the victims threatened Ramirez and a second person with a gun. The second witness, Jimmy Torrez, would have testified that he witnessed the slaying of Ramon "Chi Chi" Vasquez by Miguel Vargas, one of the victims in this case. At that time Vargas also fired two shots at Torres. Neither of these witnesses was connected in any manner with the shootings at issue and again we find that the court properly barred this speculative evidence.

■ In the final instance of precluded testimony, the defense had unsuccessfully sought to obtain a continuance in order to secure the appearance of Frank Byrne, a subpoenaed witness who failed to appear on the required date. In the presence of counsel for defendant and the State the court telephoned the witness, who suffered from multiple sclerosis. Byrne told the court that he had fallen and did not know whether he could appear the next court day, which would come after a weekend recess. Byrne's doctor also told the court that it was very doubtful Byrne could get to court under any circumstances.

The defense had represented that Byrne would testify that he lived on Gregory Street, north across the alley from the two-flat, and that he heard shots between 1:30 and 1:45 early on the morning in question and saw two men run north across Gregory into a schoolyard and then further north. However, the witness told the court over the telephone that he only saw one man. In any event, given the unlikely possibility that the witness would have been able to testify and the failure of the defense to establish the vital nature of this testimony, we find no error in the denial of the continuance. *People v. Rivera* (1978), 64 Ill. App. 3d 49, 380 N.E.2d 1018.

5

■ Defendant next contends that he should have been permitted to impeach State witness Carlos Vargas with a prior disposition of supervision received by Vargas on a theft charge. Our supreme court has held that the successful completion of a period of supervision does not result in a conviction and thus is not a proper basis for impeachment. (*People v. Schuning* (1985), 106 Ill. 2d 41, 476 N.E.2d 423.) Absent a showing that Vargas' supervisionary period was not successfully completed and resulted in an actual conviction, we find the trial court's ruling to be proper.

6

■ We next consider defendant's contention that the trial court erred when it permitted the hypnotically enhanced testimony of Officer Atkins concerning the license plate number of the vehicle he saw 2½ blocks from the shooting.

This contention raises a legal issue which has not been determined by the Illinois Supreme Court, whether hypnotically enhanced testimony should be admissible in Illinois courts. In *People v. Wilson* (1987), 116 Ill. 2d 29, the court specifically reserved that question, while generally noting the dangers inherent in the use of hypnosis on prospective witnesses. The decisions of the Illinois Appellate Court on

this issue are conflicting. As early as 1969, in *People v. Harper* (1969), 111 Ill. App. 2d 204, 250 N.E.2d 5, the Fourth District of this court indicated in *dicta* that hypnosis was not sufficiently reliable to allow its use in a criminal prosecution. But 10 years later, in *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848, that same district issued what remains the leading Illinois case supporting admission of such evidence. There a State witness was permitted to testify concerning an identification of the defendant that she was able to make only after being hypnotized. The reviewing court, with one justice dissenting, found this evidence to be properly admitted because it found certain guidelines were met: the hypnotist was competent, suggestion was not used in the hypnosis, the identification was corroborated by other evidence, and the witness had an ample opportunity to view the defendant at the time of the occurrence. In so holding the court relied, *inter alia*, on *Harding v. State* (1968), 5 Md. App. 230, 246 A.2d 302, since overruled by *State v. Collins* (1983), 296 Md. 670, 464 A.2d 1028. The court also erroneously suggested that at that time no jurisdiction barred hypnotically enhanced testimony. (See *Jones v. State* (Okla. Crim. App. 1975), 542 P.2d 1316; *Greenfield v. Commonwealth* (1974), 214 Va. 710, 204 S.E.2d 414.) The court also only briefly alluded to the problems associated with hypnosis, including "fantasy" (confabulation) and suggestibility. *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 388, 385 N.E.2d 848, 853.

In *People v. Gibson* (1983), 117 Ill. App. 3d 270, 452 N.E.2d 1368, the Fourth District reaffirmed its holding in *Smrekar*, while acknowledging that a number of jurisdictions had, since the decision in *Smrekar*, barred hypnotically enhanced evidence.

The *Smrekar* guidelines approach was adopted by the Third Division of the First District. (*People v. Jordan* (1983), 120 Ill. App. 3d 836, 458 N.E.2d 1115.) In *People v. Byas* (1983), 117 Ill. App. 3d 979, 453 N.E.2d 1141, the Third District indicated in *dicta* that it too would follow *Smrekar*. The Fifth District generally adopted the *Smrekar* approach in *People v. Cohoon* (1983), 120 Ill. App. 3d 62, 457 N.E.2d 998. But without directly deciding the issue of the admissibility of hypnotically enhanced evidence, our supreme court reversed the *Cohoon* decision. (*People v. Cohoon* (1984), 104 Ill. 2d 295, 472 N.E.2d 403.) That reversal was based on the court's determination that in any event the identification at issue, made immediately after hypnosis, was impermissibly suggestive. The court noted the risk of confabulation as well as trial testimony indicating that a hypnotist cannot distinguish truth from confabulation in a subject. Citing, *inter alia*, this same risk of confabulation, the court also determined that the

subsequent in-court identification was not independently based.

After the supreme court's *Cohoon* decision, the Fifth District, in *People v. Duckett* (1985), 133 Ill. App. 3d 639, 479 N.E.2d 355, held that the trial court properly excluded testimony by a clinical psychologist that while under hypnosis the defendant nonverbally denied committing the offenses in question. The appellate court distinguished those Illinois cases which have admitted hypnotically enhanced testimony, noting that the cause before it involved evidence elicited from a witness while still under hypnosis. But the court also generally found hypnosis to suffer from the same deficiencies as polygraph tests and truth-serum-induced evidence. Noting that in *Cohoon* the Illinois Supreme Court had expressed doubts concerning the scientific acceptability of hypnosis, the *Duckett* court held that the evidence in question was properly rejected.

The current state of the law on this point in other jurisdictions is also in conflict, although a clear trend has developed. A few jurisdictions have determined that hypnotically enhanced testimony is generally admissible, with the weight of such evidence left to the fact finders. (*Clay v. Vose* (1st Cir. 1984), 771 F.2d 1; *United States v. Awkard* (9th Cir. 1979), 597 F.2d 667; *State v. Wren* (La. 1983), 425 So. 2d 756; *State v. Commeau* (Me. 1981), 438 A.2d 454; *State v. Brown* (N.D. 1983), 337 N.W.2d 138; *State v. Glebock* (Tenn. Crim. App. 1981), 616 S.W.2d 897; *Chapman v. State* (Wyo. 1982), 638 P.2d 1280.) Some jurisdictions permit such evidence only where guidelines concerning reliability are met. (*United States v. Kimberlin* (7th Cir. 1986), 805 F.2d 210, *cert. pending* (No. 86—6445); *Spryczynatyk v. General Motors Corp.* (8th Cir. 1985), 771 F.2d 1112; *United States v. Valdez* (5th Cir. 1984), 772 F.2d 1196; *State v. Iwakiri* (1984), 106 Idaho 618, 682 P.2d 571; *House v. State* (Miss. 1984), 445 So. 2d 815; *State v. Hurd* (1981), 86 N.J. 525, 432 A.2d 86; *State v. Beachum* (N.M. Ct. App. 1981), 97 N.M. 682, 643 P.2d 246; Or. Rev. Stat. sec. 136.675 (1985); *Vester v. State* (Tex. Ct. App. 1983), 684 S.W.2d 715, *aff'd on other grounds* (Tex. Crim. 1986), 713 S.W.2d 920; *Hopkins v. Commonwealth* (1985), 230 Va. 280, 337 S.E.2d 264; *State v. Armstrong* (1983), 110 Wis. 2d 55, 329 N.E.2d 386.) But the overwhelming majority of jurisdictions which have considered this issue bar from the courtroom any hypnotically enhanced testimony. *Contreras v. State* (Alaska 1986), 718 P.2d 129; *State v. Mena* (1981), 128 Ariz. 226, 624 P.2d 1274; *Rock v. State* (1986), 288 Ark. 566, 708 S.W.2d 78, *rev'd insofar as that ban extended to a defendant's testimony* (1987), ____ U.S. ____, ____ L. Ed. 2d ____, ____ S. Ct. ____ (available June 23, 1987, on LEXIS, Genfed library, US file); *People v. Shirley* (1982), 31

Cal. 3d 18, 641 P.2d 775 (except for a defendant's own testimony); *People v. Quintanar* (Colo. App. 1982), 659 P.2d 710; *State v. Atwood* (1984), 39 Conn. Supp. 273, 479 A.2d 258; *State v. Davis* (Del. Super. 1985), 490 A.2d 601; *Bundy v. State* (Fla. 1985), 471 So. 2d 9; *Walraven v. State* (1985), 255 Ga. 276, 336 S.E.2d 798; *State v. Moreno* (Hawaii 1985), 709 P.2d 103; *Strong v. State* (Ind. 1982), 435 N.E.2d 969; *State v. Seager* (Iowa 1983), 341 N.W.2d 420; *State v. Haislip* (1985), 237 Kan. 461, 701 P.2d 775; *State v. Collins* (1983), 296 Md. 670, 464 A.2d 1028; *Commonwealth v. Kater* (1983), 388 Mass. 519, 447 N.E.2d 1190; *People v. Gonzales* (1982), 415 Mich. 615, 329 N.W.2d 743, *modified on other grounds* (1983), 417 Mich. 1129, 336 N.W.2d 751; *State v. Mack* (Minn. 1980), 292 N.W.2d 764; *Alsbach v. Bader* (Mo. 1985), 700 S.W.2d 823; *State v. Palmer* (1981), 210 Neb. 206, 313 N.W.2d 648; *People v. Hughes* (1983), 59 N.Y.2d 523, 453 N.E.2d 484, 466 N.Y.S.2d 255; *State v. Peoples* (1984), 311 N.C. 515, 319 S.E.2d 177; *State v. Weston* (1984), 16 Ohio App. 3d 279, 475 N.E.2d 805; *Jones v. State* (Okla. Crim. App. 1975), 542 P.2d 1316; *Commonwealth v. Nazarovitch* (1981), 496 Pa. 97, 436 A.2d 170; *State v. Martin* (1984), 101 Wash. 2d 713, 684 P.2d 651.

This growing body of authority rejecting the courtroom use of hypnotically enhanced testimony is also reflected in the legal and scientific literature. Dr. Bernard L. Diamond, a clinical professor of psychiatry, has exhaustively examined the problem associated with hypnosis of prospective witnesses. (Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif. L. Rev. 313 (1980).) Among the problems he identified are the following. Hypnotized subjects commonly seek to please their questioners, to the extent that they will commonly confabulate, filling in missing details with fantasy. Even experienced hypnosis experts cannot determine whether hypnotically enhanced recall is reliable and valid. Diamond notes that even specificity and richness of detail does not mean the memory is accurate; such apparent recall can be the product of confabulation. Thus Diamond cites one study in which hypnotized subjects were asked to project themselves 10 years into the future. These subjects then purported to describe their future surroundings in great detail. Diamond also notes that because of the heightened suggestibility of hypnotic subjects, the implanting of suggestion cannot be avoided. The very context and purpose of the hypnosis can be suggestive, and a hypnotist with knowledge of the facts of a case may unconsciously cue the subject concerning these facts. According to Diamond even videotaping an entire hypnosis session may not reveal all possible suggestiveness because events preceding and following the hypnosis be-

come integrated with the hypnotic experience, distorting the validity of the subject's recall. Diamond summarized his views as follows:

"I believe that once a potential witness has been hypnotized for the purpose of enhancing memory his recollections have been so contaminated that he is rendered effectively incompetent to testify. Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist. After hypnosis the subject cannot differentiate between a true recollection and a fantasy or a suggested detail. Neither can any expert or the trier of fact. This risk is so great, in my view, that the use of hypnosis by police on a potential witness is tantamount to the destruction or fabrication of evidence. *** [E]ven under stringent safeguards, including presentation to the trier of fact of the fullest possible information on the effects of hypnosis, the trier will not be able to sort out reality from witness fantasy and weigh this testimony properly." Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif. L. Rev. 313, 314-15 (1980).

A more recent survey of the scientific community's view of this issue also clearly supports exclusion of such evidence. (Note, *Trial by Trance, the Admissibility of Hypnotically Enhanced Testimony*, 20 Colum. J. L. & Soc. Probs. 237 (1986).) The author notes that after what he describes as an exhaustive review of the scientific research on hypnosis and memory, the Council on Scientific Affairs of the American Medical Association concluded that hypnosis should not be used to prepare witnesses for trial. He also cites research showing that: hypnotized subjects respond incorrectly to leading questions twice as often as nonhypnotized subjects; false memories from hypnotic recall may actually replace the original memory; hypnosis does not improve facial identification and may facilitate false positive identifications; hypnosis does not improve the accuracy of recall but does significantly increase the subject's confidence in the recollection.

One of the leading experts in this field is Dr. Martin Orne. His recommended guidelines for the admission of hypnotically enhanced testimony were adopted by the New Jersey Supreme Court in *State v. Hurd* (1982), 86 N.J. 525, 432 A.2d 86. But subsequently Dr. Orne has determined that hypnotically enhanced testimony is not reliable and should not be permitted at trial. Orne, *Hypnotically Induced Testimony*, in Eyewitness Testimony: Psychological Perspectives (Wells & Loftus eds. 1984), at 171, 211; cited in *People v. Guerra* (1984), 37 Cal. 3d 385, 423-24, 690 P.2d 635, 660-61, 208 Cal. Rptr. 162, 187-88.

Based on all these authorities we conclude that Illinois, like the clear majority of other jurisdictions in this country, should not generally permit the courtroom use of hypnotically enhanced evidence because of the fundamental problem of reliability inherent in such testimony. Because our supreme court has already determined that witnesses may testify concerning their prehypnotic recollections, we would note that this comprehensive approach will provide protection from inherently unreliable testimony while still permitting the use of hypnosis as an investigative tool. (See Harnish, *Hypnotically Refreshed Testimony: In Support of the Emerging Majority and People v. Hughes*, 33 Buffalo L.R. 417 (1984).) Our ruling does not extend to the testimony of a defendant. The United States Supreme Court has recently ruled that despite the reliability problems inherent in hypnotically enhanced testimony, a defendant's constitutional right to testify bars States from adopting a *per se* rule excluding all such testimony by a defendant. (*Rock v. Arkansas* (1987), 483 U.S. ____, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (available June 23, 1987, on LEXIS, Genfed library, US file).) This cause does not involve such testimony by a defendant and we leave for another day the question of how Illinois will accommodate a defendant's right to testify in such circumstances.

▄▄ Although we have determined that the hypnotically enhanced testimony of Officer Atkins should not have been permitted, we must still determine whether defendant was prejudiced by this evidence, as such an error has not been held to be *per se* reversible. (*State v. La Mountain* (1980), 125 Ariz. 547, 611 P.2d 551; *King v. State* (Ind. 1984), 460 N.E.2d 947.) The testimony at issue did not involve any identification of the defendant and merely corroborated other proper evidence presented by the State concerning the car which defendant allegedly used in the crime. The State presented eyewitness testimony by two witnesses identifying defendant as one of those who shot at the victims. One of those two witnesses had known the defendant for years. The State also presented testimony by a third witness that defendant admitted his participation in the shootings. Given the nature of this evidence we are not persuaded that defendant was prejudiced by the hypnotically enhanced evidence, which merely related to a description of the car seen blocks away from the crime scene. Accordingly, we will not reverse on this ground.

7

▄▄ Although defendant contends that certain photographs of the victims were unnecessarily gruesome and should not have been shown to the jury, defendant has failed to include those photographs

on appeal and we will not consider the issue further. We would only note that ordinarily such matters are within the considerable discretion of the trial court. *People v. Hayes* (1979), 70 Ill. App. 3d 811, 388 N.E.2d 818.

8

■■ The final contention we consider is that the court should have given the jury defendant's non-IPI instruction concerning guidelines for evaluating eyewitness identification testimony. The Committee on Jury Instructions recommends that no separate instruction be given on identification evidence and that the matter be left to final argument. (Illinois Pattern Jury Instructions, Criminal, No. 3.15 (2d ed. 1981).) We find no abuse of discretion in the court's refusal of this instruction. *People v. Hefner* (1979), 70 Ill. App. 3d 693, 388 N.E.2d 1059.

For the reasons set forth in this opinion we affirm the defendant's conviction.

Affirmed.

SULLIVAN, P.J., and MURRAY, J., concur.