THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
THOMAS CROWDER, Defendant-Appellant.

First District (5th Division)   No. 80—1204

Opinion filed September 30, 1987.—Rehearing denied November 10, 1987.

PINCHAM, J., dissenting.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, James S. Veldman, and Karyn Stratton, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

In a jury trial defendant Thomas Crowder was convicted of murder and sentenced to an extended term of 60 years. On appeal he contends: (1) the prosecution improperly used their peremptory challenges to exclude women from the jury; (2) defendant was denied his right to a speedy trial; (3) defendant was prejudiced when an *in camera* hearing concerning his possible danger to his wife, a State witness, was held outside of his presence; (4) the trial court erroneously restricted defense cross-examination; (5) admission of evidence of defendant's arrest for unrelated crimes was unduly prejudicial; (6) improper closing argument denied defendant a fair trial; (7) defendant was denied effective assistance of counsel.

We affirm.

Defendant has not challenged the sufficiency of the evidence of his guilt. Accordingly we will summarize that evidence only to the extent necessary for consideration of the issues raised.

Two of defendant's alleged accomplices, Earl and Derelon Mc-Dade, testified for the State. Earl, 18 years old at the time of trial,

testified that on October 8, 1978, defendant told him that the victim, Tony Ross, had set him up on a "reefer bust" and he was going to pay him back. Earl and Derelon both testified that the following day they and Enzie Williams accompanied defendant when he abducted Ross at gunpoint from a parking lot and drove him to the back lot of a factory in Chicago.

Earl admitted driving defendant's car for part of the trip and then holding the gun on Ross when defendant took over the driving. At the factory lot defendant, who again had the gun, forced Ross to step down. He then sent Earl and Enzie to park the car. When they returned Ross was on his knees, with injuries to his head. He was begging for his life, saying this was a mistake. Defendant, holding a business-card-size piece of paper, said he knew the victim had done this. He then picked up a green board. Earl turned his head, heard seven or eight cracks, and never looked back at the victim. He and his brother returned to the car.

Derelon, who was 16 years old at the time of the crime, testified that after they arrived at the factory lot and Earl left to park the car, defendant forced Ross to his knees and beat him about his face with the gun. Defendant told Ross he had "messed up" his family and he was going to kill him. When Earl and Enzie returned, defendant asked the three of them what to do with Ross. Derelon said to just beat him, Enzie said to kill him, and Earl said nothing. Defendant, who, Derelon recalled, had earlier said he knew Ross had set him up, picked up a card the size of a business card. He then obtained an ice pick from Enzie and tried to force it into Ross's chest. Ross resisted, begging for his life, and Derelon never saw it enter Ross. (Earl denied ever seeing an ice pick.) Defendant then dropped the ice pick, picked up a green board, and repeatedly struck Ross on the head with it. Derelon confirmed that his brother was facing in the other direction as this occurred.

After these blows were struck Ross fell to the ground, appearing to Derelon to be dead. On defendant's instructions Derelon and Earl threw the board away and then went to the car. In 15 minutes Enzie and defendant rejoined them and they all drove away.

Earl admitted that at the parking lot that day he had smoked five or six marijuana cigarettes and had drunk a quart of wine in the half hour before the abduction. However, he stated that although he was "really gone" and was drunk, he had a clear memory of what took place. Earl also admitted that while in jail he had signed a statement saying defendant had nothing to do with the Ross killing. Earl explained that he had not read the statement before signing it. Defend-

ant, who was in jail with him at the time, had prepared it and had told him it was a motion to quash arrest which would free Earl in 120 days. Earl also admitted that he was charged with murder in the case but the State had promised to drop charges if he cooperated. He had been told by his lawyer that cooperation could help him avoid the electric chair.

Derelon admitted that he had been told he could be tried as an adult. After "volunteering" to testify for the State he was transferred to the juvenile authority from an adult facility.

Ross, still alive, was found by the police later that afternoon. A nail-studded green board, identified by Derelon and Earl as resembling the one used by the defendant, was found nearby. The neurological surgeon who treated Ross testified that he remained unconscious until his death on October 20, 1978. The cause of death was severe brain trauma caused by blows which could have been administered by the board found at the scene.

Defendant's wife Dorothy also testified for the State, relating a series of incriminating statements and actions by the defendant. On October 9 at 11:55 p.m., the night of the incident, she heard defendant tell his nephew, Perry Castleberry, that he did not have to worry about Ross anymore because he had killed him. At their home, Dorothy saw defendant's clothes in the bathtub with blood on them. Defendant told her he had cut himself working on a car, but she saw no injuries on him. The next morning defendant took the clothes and left with Enzie Williams, who was Dorothy's brother. Defendant told Enzie he was going to burn them because they were evidence.

On October 15 defendant again told Castleberry he did not have to worry about Ross because he had "iced" him. On the 16th, defendant said if he stayed away for five years the murder charge would be dropped. That same day defendant, Dorothy, their children, Enzie and Earl went to defendant's brother's home in Gary. Defendant told Enzie that he had helped defendant with the murder and so was an accomplice.

On October 30 they went to Detroit, where Dorothy rented an apartment. On November 7, 1978, defendant pulled a gun on them, saying they were all in it together and nobody was going anywhere.

Dorothy admitted falsely telling the police that she knew nothing of the incident. According to Dorothy, as late as August 3, 1979 (trial began August 14), she still planned to testify for her husband. The defendant had asked her to lie. However, a week later she decided to testify for the State.

Several other State witnesses provided corroborating testimony.

Chicago police officer Glen Godbold testified that on October 5, 1978, he spoke to Tony Ross and gave him a card with his name and number. On October 7 he arrested defendant and several other people for certain misdemeanors. However, those arrests were not based on any conversation with Ross. Sharlene Griffin testified that on the afternoon in question she saw defendant and Enzie Williams approach Ross in the parking lot. Enzie told Ross to come into the alley, where they wanted to talk to him. Defendant, Enzie, Ross, and the McDade brothers then all went into the alley. Griffin recalled that defendant looked angry.

Linda Carter, a former girlfriend of Tony Ross', testified that on October 8, 1978, defendant told her she would not see him or Ross anymore. Debbie Robinson, who lived with Perry Castleberry, testified that on October 15 she overheard defendant tell him they did not have to worry about Ross "messing" with the family business because he "took care" of Ross.

Defendant presented no witnesses in his own behalf.

OPINION

1

■■■ We find no merit to defendant's contention that he is entitled to a *Batson* hearing (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712), because of the State's use of peremptory challenges to exclude women from the jury. As this court recently held in *People v. Zayas* (1987), 159 Ill. App. 3d 554, a *Batson* claim requires a showing that a prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. This male defendant lacks standing to challenge the exclusion of women from the jury on this ground. Furthermore, defendant's reliance on his sixth amendment right to a jury drawn from a representative cross-section of the community is also unavailing. As we also noted in *Zayas,* the United States Supreme Court has specifically declined to extend the fair cross-section requirement to petit juries. *Lockhart v. McCree* (1986), 476 U.S. 162, 174, 90 L. Ed. 2d 137, 148, 106 S. Ct. 1758, 1765; *Buchanan v. Kentucky* (1987), 483 U.S. ___, 97 L. Ed. 2d 336, 107 S. Ct. 2906.

2

■ We also find no merit to defendant's contention that he was not brought to trial within 120 days as required by the speedy trial act. (Ill. Rev. Stat. 1985, ch. 38, par. 103—5.) The record establishes

that at the hearing on defendant's motion for discharge defendant withdrew his motion, apparently because he believed the motion would be unsuccessful. Defendant accordingly has waived this issue. (*People v. Pearson* (1981), 88 Ill. 2d 210, 430 N.E.2d 990.) We would also note that, in any event, our computation establishes that when delays attributable to defendant are excluded he was brought to trial within 98 days, well within the requisite time period.

3

■ Defendant also contends he was prejudiced because he was barred from certain *in camera* proceedings concerning his wife's fear of him and because the contents of those proceedings were not disclosed to him.

Prior to trial a hearing was held on defendant's motion to suppress certain statements made by him. At that hearing defendant's counsel asked investigator Gary Hill, one of the arresting officers, whether defendant's wife was at the police station voluntarily at the time defendant was being questioned. Hill responded that he would rather not answer that question because a question of safety was involved. An *in camera* proceeding was then held outside the presence of the defendant. In that proceeding the State revealed that defendant's wife had aided the police in locating the defendant. She had also expressed a fear of defendant to the police. In addition, defendant himself had asked the police who had informed on him.

Defense counsel expressed his intent to continue this line of questioning because it appeared that defendant's wife had been utilized by the police to obtain statements from him. However, the State then stipulated that it would not utilize these statements in its case in chief. Defense counsel agreed to the court's suggestion that if the State sought to use those statements as impeachment, in the event defendant testified, a hearing on voluntariness would first be held. Defense counsel also stated that the only reason he had wished to pursue this questioning was in support of the motion to suppress. The court noted that this goal was met when the State agreed not to use the statements. The court then ordered the transcript impounded and instructed defendant's counsel not to disclose to defendant, without further order of the court, the information that defendant's wife had aided the police in apprehending him. The court indicated that it took this action because it found there was "some reason to give credence to what the police officer said [*sic*]." During the hearing the State and defense counsel stated they were presently unable to locate defendant's wife.

On the record, in defendant's presence, the State informed the court it would not use defendant's statements in its case in chief. Defense counsel stated that because his motion to suppress had in effect been sustained he would not pursue it further. Defendant then personally objected to the *in camera* proceeding and stated that it appeared his wife might be cooperating with the State.

Defendant now contends that these proceedings violated his constitutional rights to appear and defend in person and to confront witnesses. However, the *in camera* proceeding at issue here did not detrimentally affect the defendant. His counsel obtained the effective suppression of his statements. Although defendant contends that he had been relying on his wife to assist him in his defense, he in fact had testified at the suppression hearing that he was no longer in contact with her and did not know where she was. Defendant also contends that the trial court demonstrated "some amount of predisposition" to assume defendant's guilt by giving credence to the State's theory that defendant's wife feared defendant. Defendant contends that had he been aware of this attitude he would have moved for a substitution of judge for cause. We find this argument to be without merit. The court merely acted to protect a potential witness based upon information presented by the State. That action did not adversely affect defendant in his defense; indeed, it was premised upon a State agreement not to utilize apparently incriminating statements made by the defendant. The cases cited by defendant are inapposite. In *People v. Etheridge* (1976), 35 Ill. App. 3d 981, 343 N.E.2d 55, the defendant was not present at his sentencing hearing. In *People v. Grigsby* (1977), 47 Ill. App. 3d 812, 365 N.E.2d 481, defendant was not present at a hearing when testimony was heard concerning a possible conflict of interest by defendant's counsel. Here, no testimony was heard at the *in camera* proceeding and defendant was not adversely affected by the outcome of that proceeding. Because defendant has failed to demonstrate any prejudice arising from this procedure we find no basis for reversal of his conviction. *People v. Harvey* (1981), 95 Ill. App. 3d 992, 420 N.E.2d 645.

4

■■ We next consider defendant's contention that the trial court erroneously restricted defense cross-examination of certain witnesses. In the first such alleged instance defense counsel was questioning Linda Carter about when she first told police that defendant told her she would not be seeing Ross anymore. Counsel asked Carter if she went to the police. She answered "No, they came to me—." Her re-

maining answer was cut off by a successful State objection on relevancy grounds. However, the answer was not stricken, nor was the jury instructed to disregard it. Defendant contends only that he should have been permitted to adduce from the witness the information that the police had sought her out. Clearly this information was brought out and thus we find no prejudice.

In the second instance the defendant asserts that the trial court precluded any questioning of Debbie Robinson (who lived with Perry Castleberry) concerning whether she was aware Castleberry was a suspect in the case. Robinson had testified that she heard defendant say he "took care" of Ross. Defendant contends he was thus precluded from seeking to establish that she had incriminated defendant to protect Castleberry. But the record establishes no such preclusion. The trial court acknowledged that questioning the witness about her state of mind on this issue was relevant and permissible. The court merely found that the question as framed was too broad and called for an answer that could be based on conjecture and speculation. The court clearly indicated that counsel should elicit the underlying facts from which such a conclusion could be drawn. Indeed, defense counsel thereupon did elicit from the witness the information that at the time she told police of the statement she knew Castleberry had been placed in a lineup. However, on redirect the State brought out that the witness also knew Castleberry was not identified in that lineup. Accordingly, we find no error in the trial court's action.

The final allegation of erroneously restricted cross-examination concerns Derelon McDade. Derelon admitted that he was transferred from Cook County jail to a juvenile facility after agreeing to testify for the State. However, the trial court barred defense counsel from then asking Derelon whether his attorney had explained to him that he was going to "cut a deal." The court required that counsel first ask this question outside the presence of the jury, presumably as a prelude to asking the question before the jury only if defendant acknowledged the conversation. Defense counsel declined the opportunity. We find that the trial court erred in thus restricting defendant's constitutional right of cross-examination. It has long been recognized that cross-examination is necessarily exploratory and therefore a cross-examiner is to be given reasonable latitude even though he cannot establish beforehand what facts that examination may adduce. (*Alford v. United States* (1931), 282 U.S. 687, 75 L. Ed. 624, 51 S. Ct. 218; *People v. Baptiste* (1976), 37 Ill. App. 3d 808, 347 N.E.2d 92; see *People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9.) We also find, however, that given the overwhelming evidence of defendant's guilt in

this cause, the error was harmless beyond a reasonable doubt. *People v. Wilkerson* (1981), 87 Ill. 2d 151, 429 N.E.2d 526.

5

■ Defendant also contends that it was prejudicial error for the court to admit evidence that defendant was involved in other crimes. Such evidence is of course admissible to show motive. (*People v. Roberts* (1981), 100 Ill. App. 3d 469, 426 N.E.2d 1104.) In this cause the State's theory was that defendant killed the victim because he believed that the victim had caused his arrest. In support of this theory the State sought to introduce evidence that defendant had been arrested several days prior to the attack on Ross. The court permitted the State to do this but specifically instructed them to adduce the additional fact that the arrest was for misdemeanors, without revealing that the specific crimes were for unlawful use of weapons and contributing to the delinquency of a minor. At the State's request a 10-minute recess was declared so that the next witness, Officer Godbold, could be so instructed. On direct examination Godbold testified that on October 7 he arrested defendant for a misdemeanor. However, on cross-examination, after defense counsel adduced the information that the arrest was based on a complaint, the following ensued:

"[Defense Counsel]: Who was the signator of the complaint?

A. There were two complaints actually. One was for contributing to the delinquency of a minor. One—

Q. I asked you what the names of the signatory of the complaint was, who signed the complaint.

A. The name on the U.U.W. was—

Q. Who signed the complaint.

[The Court]: The name of the person that signed the complaint."

Defense counsel then elicited from the witness the fact that a woman had signed the complaints and that defendant's arrest had nothing to do with information provided by Tony Ross. Clearly, the responses of this officer were in violation of the trial court's order. But we find no basis for ascribing these answers to prosecutorial misconduct, as suggested by defendant. As we have noted, it was the State that obtained a recess in order to instruct the witness. In any event, defendant failed to object to these answers or to seek any cautionary instructions. Accordingly, we find the issue to have been waived. *People v. Zehr* (1984), 103 Ill. 2d 472, 469 N.E.2d 1062.

6

We find no merit to defendant's contention that he was denied a fair trial by improper closing argument. Suffice it to say that upon review of all the arguments we have found that the comments at issue were either responsive to argument of defense counsel or constituted fair comment on the evidence.

7

■ Defendant's final contention is that he was denied effective assistance of counsel by being forced to accept an attorney with whom he had substantial conflicts. The record establishes that prior to trial defendant declined the trial court's offer to have substitute counsel appointed. The record also documents the vigorous and able representation provided by trial counsel, representation which was clearly within the range of competent professional assistance. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Therefore we find no merit to the contention.

For the reasons set forth in this opinion we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P.J., concurs.

JUSTICE PINCHAM, dissenting:
I dissent. The constitutions of the United States and the State of Illinois prohibited Assistant State's Attorneys Jay Magnuson and Thomas O'Donnell from exercising the State's peremptory challenges to purposefully and systematically exclude women from jury service simply because of their sex.

On September 17, 1787, two hundred years ago last month, the constitution of this nation was drafted. It did not then include well over one-half of the people of the nation. It excluded women, blacks and native Americans from its protections, rights, privileges and guarantees. This year, two hundred years later, the nation celebrates the bicentennial anniversary of that constitution. Today, after two hundred years; today, after a civil war with multitudinous fatalities and injuries; today, after numerous amendments to that constitution; today, after acts of terrorism, lynchings, and atrocities too despicable to relate; today, after infinite human distress and pain; today, after repeated acts of Congress and State legislatures; today, after many court decisions; today, after mass demonstrations and protestations,

the struggle yet continues to bring the excluded within the protections, rights and privileges of that document. The most ingenious, but fallacious, concepts conceivable by the minds of men have been concocted to perpetuate their exclusion and to impede their inclusion. Although certainly not original, the prosecutors' exercise of peremptory challenges in the case at bar to exclude women from jury service solely because of their sex is just another of the many contemptible obstacles on the road to equality for this nation's majority—women. But even after two hundred years, the faith of the excluded still must not falter. Today, after two hundred years, expressions of abhorrence to sexism (and racism) continue to be uttered. The Chicago Tribune, May 11, 1987, section 1, page 12, editorial voiced its hostility to sexism (and racism) thusly:

"IT'S ALSO THE BICENTENNIAL OF A WRONG

Justice Thurgood Marshall of the U.S. Supreme Court has rescued the bicentennial of the U.S. Constitution from sanctimonious dullness and historical error. In a controversial speech the other day, Justice Marshall said that he did not find 'the wisdom, foresight and sense of justice exhibited by the framers particularly profound. To the contrary, the government they devised was defective from the start ***.'

He was talking about the original Constitution's acceptance of slavery and refusal to accord women the vote. And he was right. These were deep and abiding flaws in an otherwise remarkable and enlightened piece of work. And they led to grave consequences.

\* \* \*

*** [T]he tolerance of slavery and exclusion of women from political society contradicted the whole philosophical foundation of the Constitution, which had been built on enlightenment ideals of individual freedom, dignity and popular sovereignty.

\* \* \*

And it is a measure of how benighted were the Framers with respect to liberty, dignity and equality of women that the question of female suffrage received no significant debate.

In honoring the creation of the American republic, the document that gave it life and the people who wrote the text, it is not necessary to overlook their failures, which perpetuated untold human suffering, led to the nation's bloodiest war and left an unconscionable legacy that the country still struggles to overcome. A free people celebrates its history by attempting to grasp it in its fullness, the glory and the flaws.''

The Chicago Defender editorial, Thursday, September 3, 1987, page 25, denounced sexism (and racism) in the following language:

"A cursory review of this great nation of ours shows that in spite of its majesty, it still has not seriously addressed the racism and sexism that daily plague it. *** The corporate boardrooms and executive suites of our country are, for the most part, closed to women and other minorities. These conditions are the result of unwritten laws which persist in getting support from racists and sexists across the land.

Many times, these minorities and women seem to be the target of some purposeful, punitive acts by unseen negative forces at work. *** Therefore, we should not be shocked that women and other minorities have gained little in the years of affirmative action. ***"

The defendant in the case at bar was charged with the commission of and the evidence established that he committed horrible crimes, but the horrendousness of his transgressions is no justification for and does not warrant a relaxation or convolution of constitutional principles and the continued perpetuation of discrimination against the nation's women—our mothers, grandmothers, daughters, sisters, aunts, cousins, wives and friends. In the case at bar, the prosecutors exercised their peremptory challenges to systematically exclude women from the defendant's jury simply because of their sex.

The defendant, a 37-year-old black male, was charged with the capital offense of murder, aggravated kidnapping and armed violence of Tony Ross, a 20-year-old black male. Pursuant to the prosecutors' request, during *voir dire* examination the jury was qualified under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, to impose the death penalty. The jury venire consisted of 92 persons. Forty-three were excused for various reasons upon preliminary *voir dire* examination by the trial judge. There remained 27 men and 22 women for further *voir dire* examination. Because this was a capital case, the State and the defendant were each allowed 20 peremptory challenges. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(e).) Twelve of the thirteen peremptory challenges exercised by the prosecutors were exercised against female members of the venire. The jury that was selected consisted of 11 men and 1 woman. In selecting the four alternate jurors, the State and the defendant were each entitled to four peremptory challenges. The prosecutors exercised all four of their peremptory challenges against female members of the venire in the selection of the four alternate jurors, who, when finally chosen, were all male. Thus, of the 17 challenges exercised by the prosecutors

in selecting the 12 jurors and 4 alternate jurors, 16 challenges were exercised against females, and of the 12 jurors and 4 alternate jurors, only one was a female. The defendant contends that this lone female on his jury was merely a token; that he was tried and convicted by an overwhelmingly male–dominated death-qualified jury.

The defendant objected to the State's exclusion of females from his jury. He stated:

> "And I want also to object to the fact that the assistant State's Attorney here during the course of picking the jury systematically eliminated every young women [sic] and in general every black women [sic], young black women, from the jury."

The prosecutors did not respond to the defendant's objection, nor did the trial court.

The defendant contends that the prosecutors' exercise of peremptory challenges to intentionally, purposefully and systematically exclude females from his jury simply because of their sex violated his rights to an impartial jury from a fair representative cross-section of the community and to the equal protection of the laws guaranteed by the sixth and fourteenth amendments of the Constitution of the United States and article I, sections 2 and 8, of the Constitution of the State of Illinois.

Section 2 of article I of the Illinois Constitution, provides: "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." Section 8 provides: "In all criminal prosecutions, the accused shall have the right to *** a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." The sixth amendment to the Constitution of the United States provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed ***." It is provided in the fourteenth amendment to the United States Constitution: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The supreme court of Illinois has not upheld a prosecutor's use of peremptory challenges to exclude women from jury service simply because of their sex against due process, equal protection or trial by jury constitutional claims, nor has the Supreme Court of the United States. A sequential analysis and review of court decisions on the constitutional validity of a prosecutor's use of peremptory challenges and the prosecutor's systematic exclusion of identifiable groups from jury service by varying devices are illuminat-

ing and informative.

The following quote from *Glasser v. United States* (1942), 315 U.S. 60, 84, 86 L. Ed. 680, 706-07, 62 S. Ct. 457, 471, is instructive: "Since it was first recognized in Magna Carta, trial by jury has been a prized shield against oppression, but while proclaiming trial by jury as 'the glory of the English law,' Blackstone was careful to note that it was but a 'privilege.' *Commentaries,* bk. 3, p. 379. Our Constitution transforms that privilege into a right in criminal proceedings in a federal court. This was recognized by Justice Story: 'When our more immediate ancestors removed to America, they brought this great privilege (trial by jury in criminal cases) with them, as their birthright and inheritance, as a part of that admirable common law which had fenced round and interposed barriers on every side against the approaches of arbitrary power. It is now incorporated into all our state constitutions as a fundamental right, and the Constitution of the United States *** .' "

In *Smith v. Texas* (1940), 311 U.S. 128, 85 L. Ed. 84, 61 S. Ct. 164, the black defendant was convicted of rape on an indictment returned by a grand jury from which blacks had been intentionally and systematically excluded because of their race. The defendant contended that the indictment was therefore obtained in violation of the fourteenth amendment: "No State shall *** deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., amend. XIV.) The Supreme Court agreed, reversed and held, *"It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.* For racial discrimination to result in the exclusion from jury service or otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government. *** The Fourteenth Amendment requires that equal protection to all must be given—not merely promised."[1] (Emphasis added.) 311 U.S. 128, 130, 85 L. Ed. 84, 86, 61 S. Ct. 164, 165.

In *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457, although the jury was composed of six men and six women, the defendants contended that they were denied trial by an impartial jury guaranteed by the sixth amendment because only women who were members of the Illinois League of Women Voters

---

[1]The supreme court of California stated in *People v. Wheeler* (1978), 22 Cal. 3d 258, 267, 583 P.2d 748, 755, 148 Cal. Rptr. 890, 896, "[I]n such a war the courts cannot be pacifists."

were included in the jury panel from which the jury was selected and that women who were not members of the league "but otherwise qualified" were systematically excluded. A unanimous Supreme Court held:

> "Lest the right of trial by jury be nullified by the improper constitution of juries, the notion of what a proper jury is has become inextricably intertwined with the idea of a jury trial. ***
>
> *** Our notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government. For 'It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' *Smith v. Texas* [1940], 311 U.S. 128, 130, 85 L. Ed. 84, 86, 61 S. Ct. 164, 165.
>
> *** [T]he proper functioning of the jury system, and, indeed, *our democracy itself, requires that the jury be a 'body truly representative of the community,'* and not the organ of any special group or class. *** [T]he officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. *Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted.* That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right. Steps innocently taken may one by one lead to the irretrievable impairment of substantial liberties." (Emphasis added.) 315 U.S. 60, 85-86, 86 L. Ed. 680, 707, 62 S. Ct. 457, 471-72.

The Supreme Court concluded in *Glasser* that if the defendants had established in the trial court that women who were not members of the Illinois League of Women Voters were excluded from jury service, as alleged in Glasser's affidavit, it would have been compelled to set aside the trial court's denial of the defendants' motion for a new trial and grant a new trial, but that the defendant's failure to prove this contention was fatal. 315 U.S. 60, 87, 86 L. Ed. 680, 708, 62 S. Ct. 457, 472.

Although it is a civil case, the following language of the Supreme Court in *Thiel v. Southern Pacific Co.* (1946), 328 U.S. 217, 220, 90 L. Ed. 1181, 1184-85, 66 S. Ct. 984, 985-86, where all persons who worked for a daily wage were excluded from the jury, is also appropriate: "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. [Citations.] This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. *Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury.*" (Emphasis added.)

In *Ballard v. United States* (1946), 329 U.S. 187, 91 L. Ed. 181, 67 S. Ct. 261, women were systematically excluded from the panel of grand and petit jurors. An indictment was returned. The defendant's motion to quash the indictment and his challenge to the array of the petit jurors based on the exclusion of women from the panel were denied. Congress had provided in the Judicial Code that jurors in Federal court have the same qualifications as those of the highest court of law in the State. The Supreme Court pointed out that "[t]hese provisions reflect a design to make the jury 'a cross-section of the community' and truly representative of it," and, "[t]he system of jury selection which Congress had adopted contemplated, therefore, that juries in the federal courts sitting in such States would be representative of both sexes. If women are excluded, only half of the available population is drawn upon for jury service." 329 U.S. 187, 191-92, 91 L. Ed. 181, 184-85, 67 S. Ct. 261, 263.

In holding that the indictment must be dismissed, the Supreme Court in *Ballard* relied on *Thiel* and stated:

"We conclude that the purposeful and systematic exclusion of women from the panel in this case was a departure from the scheme of jury selection which Congress adopted and that, as in the *Thiel* case, we should exercise our power of supervision over the administration of justice in the federal courts [citation] to correct an error which permeated this proceeding.

*** Yet it is not enough to say that women when sitting as jurors neither act nor tend to act as a class. Men likewise do not act as a class. But, if the shoe were on the other foot, *who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel?*" (Emphasis added.) 329 U.S. 187, 193, 91 L. Ed. 181, 185-86, 67 S. Ct. 261, 264.

The following language in *Ballard* is also an appropriate directive to the case at bar: "[T]he exclusion of women from jury panels may at times be highly prejudicial to the defendants. But reversible error does not depend on a showing of prejudice in an individual case. *The evil lies in the admitted exclusion of an eligible class or group in the community* in disregard of the prescribed standards of jury selection. *The systematic and intentional exclusion of women, like the exclusion of a racial group, Smith v. Texas* [1940], 311 U.S. 128, 85 L. Ed. 84, 61 S. Ct. 164, *or an economic or social class, Thiel v. Southern Pacific Co.* [1945], 328 U.S. 217, 90 L. Ed. 1181, 66 S. Ct. 984, 166 A.L.R. 1412, *supra, deprives the jury system of the broad base it was designed by Congress to have in our democratic society. *** As well stated in *United States v. Roeming* [N.D. Iowa 1943], 52 F. Supp. 857, 862, 'Such action is operative to destroy the basic democracy and classlessness of jury personnel.' *It 'does not accord to the defendant the type of jury to which the law entitles him. ***'* [Citation.] *The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.*" (Emphasis added.) 329 U.S. 187, 195, 91 L. Ed. 181, 186-87, 67 S. Ct. 261, 265.

The 19-year-old black defendant in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, relied on his fourteenth amendment constitutional right to the equal protection of the laws in condemning the all white jury which convicted him of rape of a 17-year-old white girl and sentenced him to death. Of the eight blacks who were on the jury venire in *Swain,* two were exempt from jury service and the prosecutor excused the remaining six by peremptory challenges. The Supreme Court held that the prosecutor's excusal of the blacks from the jury by peremptory challenges in a single case did not constitute a denial of equal protection of the laws under the fourteenth amendment. The Supreme Court further held that to sustain an allegation of a fourteenth amendment equal protection violation, a defendant must establish that the prosecutor systematically and purposefully excluded blacks from the juries because of their race by the

exercise of peremptory challenges repeatedly in a series of cases over an extended period. The Supreme Court concluded that because the defendant had not established this burden no constitutional violation occurred and affirmed the defendant's conviction.

Justice Goldberg, with whom Chief Justice Warren and Justice Douglas joined, dissented in *Swain* and stated: "[T]he court today *** creates additional barriers to the elimination of jury discrimination practices which have operated in many communities to nullify the command of the Equal Protection Clause." (380 U.S. 202, 231, 13 L. Ed. 2d 759, 779, 85 S. Ct. 824, 842.) In further urging that *Swain* was wrongly decided, Justice Goldberg additionally stated: "[N]o good reason exists to fashion a new rule of burden of proof, which will make it more difficult to put an end to discriminatory selection of juries on racial grounds and will thereby impair the constitutional promise of 'Equal Protection of the Laws' ***. *** [T]he court today allies itself with those 'that keep the word of promise to our ear and break it to our hope.' " (380 U.S. 202, 241-42, 13 L. Ed. 2d 759, 785, 85 S. Ct. 824, 847.) Justice Goldberg additionally stated: "The Court *** imposes substantial additional burdens upon Negro defendants such as petitioner, because of its view of the importance of retaining inviolate the right of the State to use peremptory challenges. I believe, however, that the preference granted by the Court to the State's use of the peremptory challenge is both unwarranted and unnecessary." (380 U.S. 202, 241, 13 L. Ed. 2d 759, 785, 85 S. Ct. 824, 847.) Expanding on his condemnation of the majority's holding in *Swain,* Justice Goldberg insisted that "where systematic exclusion has been shown," the State should be required "to justify its use of peremptories or to negative the State's involvement in discriminatory jury selection." 380 U.S. 202, 245, 13 L. Ed. 2d 759, 787, 85 S. Ct. 824, 849.

The injustice of *Swain* remained intact for 21 years and it is impossible to calculate the immeasurable racial injustices perpetuated under its authority during those years.

Three years after *Swain,* the Supreme Court in *Duncan v. Louisiana* (1968), 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444, decided that the provision of the sixth amendment to the Constitution of the United States that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed" (U.S. Const., amend. VI), was applicable to and binding upon the States by the due process clause of the fourteenth amendment, which provides, "[N]or shall any State deprive any person of life, liberty, or

property without due process of law ***" (U.S. Const., amend. XIV).

Four years after *Duncan* and seven years after *Swain*, the Supreme Court decided *Peters v. Kiff* (1972), 407 U.S. 493, 33 L. Ed. 2d 83, 92 S. Ct. 2163. In *Peters*, blacks were systematically excluded from the grand jury that indicted the defendant and from the petit jury that convicted him of burglary. The State contended in *Peters* that because the defendant was white and not black he had not suffered any unconstitutional discrimination. The court rejected this contention, stating: *"[W]hen a grand or petit jury has been selected on an impermissible basis, the existence of a constitutional violation does not depend on the circumstances of the person making the claim,"* and *"whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law."* (Emphasis added.) 407 U.S. 493, 498, 504, 33 L. Ed. 2d 83, 91, 95, 92 S. Ct. 2163, 2166, 2169.

The following Supreme Court language in *Peters* is also instructive in the case at bar:

"The exclusion of Negroes from jury service, like *the arbitrary exclusion of any other well-defined class of citizens, offends a number of related constitutional values.*

In *Strauder v. West Virginia,* 100 U.S. 303, 308-09, 25 L. Ed. 664, 665, 666 (1880), this Court considered the question from the point of view of the Negro defendant's right to equal protection of the laws. ***

But even in 1880 the Court recognized that other constitutional values were implicated. In *Strauder*, the Court observed that the exclusion of Negroes from jury service injures not only defendants, but also other members of the excluded class: it denies the class of potential jurors the 'privilege of participating equally *** in the administration of justice,' 100 U.S., at 308, 25 L. Ed. at 666, and it stigmatizes the whole class, even those who do not wish to participate, by declaring them unfit for jury service and thereby putting a 'brand upon them, affixed by law, an assertion of their inferiority.' [Citation.] ***

Moreover, the Court has also recognized that the exclusion of a discernible class from jury service injures not only those defendants who belong to the excluded class, but other defendants as well, in that it destroys the possibility that the jury will reflect a representative cross-section of the community. In *Williams v. Florida,* 399 U.S. 78, 26 L. Ed. 2d 446, 90 S. Ct. 1893

(1970), we sought to delineate some of the essential features of the jury that is [*sic*] guaranteed, in certain circumstances, by the Sixth Amendment. We concluded that it comprehends, *inter alia,* 'a fair possibility for obtaining a representative cross-section of the community.' 399 U.S., at 100, 26 L. Ed. 2d, at 460. *Thus if the Sixth Amendment were applicable here, and petitioner were challenging a post-Duncan petit jury, he would clearly have standing to challenge the systematic exclusion of any identifiable group from jury service."* (Emphasis added.) 407 U.S. 493, 498-500, 33 L. Ed. 2d 83, 91-92, 92 S. Ct. 2163, 2166-67.

In disapproving the systematic exclusion of an identifiable class of citizens from jury service, the following language of the Supreme Court in *Peters* is applicable to the systematic exclusion of women from the jury in the case at bar: "But the exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases. *** Moreover, we are unwilling to make the assumption that the exclusion of Negroes has relevance only for issues involving race. *When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.* It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." (Emphasis added.) 407 U.S. 493, 503-04, 33 L. Ed. 2d 83, 94, 92 S. Ct. 2163, 2169.

Following *Peters,* the United States Supreme Court decided *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, which involved the systematic exclusion from jury service of a class of citizens who comprised a substantial and identifiable segment of the community—women. In *Taylor,* the defendant, a male, was charged with aggravated kidnapping. The Louisiana Constitution and a provision of the Louisiana Code provided that a woman should not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service. The defendant filed a pretrial motion to quash the petit jury venire on the ground that the Louisiana Constitution and Code systematically excluded women from the venire and that the defendant was therefore deprived of his sixth amendment constitutional right to a trial by a jury

composed of a representative segment of the community. The defendant's motion to quash the venire was denied. There were no females on the venire and the defendant was found guilty and sentenced to death by an all male jury. The Supreme Court stated that the issue before it was "whether a jury-selection system which operates to exclude from jury service an identifiable class of citizens constituting 53% of the eligible jurors in the community comports with the Sixth and Fourteenth Amendments." 419 U.S. 522, 525-26, 42 L. Ed. 2d 690, 695, 95 S. Ct. 692, 695.

The State's initial contention in *Taylor* before the Supreme Court was that the male defendant, Taylor, had no standing to object to the exclusion of women from his jury, which was analogous to the State's contention that the white defendant lacked standing to object to the exclusion of blacks in *Peters*. The Supreme Court in *Taylor* responded, as it similarly responded in *Peters*: "Taylor's claim is that he was constitutionally entitled to a jury drawn from a venire constituting a fair cross section of the community and that the jury that tried him was not such a jury by reason of the exclusion of women. Taylor was not a member of the excluded class; but there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service. In *Peters v. Kiff*, 407 U.S. 493, 33 L. Ed. 2d 83, 92 S. Ct. 2163 (1972), the defendant, a white man, challenged his conviction on the ground that Negroes had been systematically excluded from jury service. Six Members of the Court agreed that petitioner was entitled to present the issue and concluded that he had been deprived of his federal rights. Taylor, in the case before us, was similarly entitled to tender and have adjudicated the claim that the exclusion of women from jury service deprived him of the kind of factfinder to which he was constitutionally entitled." 419 U.S. 522, 526, 42 L. Ed. 2d 690, 695-96, 95 S. Ct. 692, 696.

After holding that Taylor had standing to challenge the exclusion of females from his jury, the Supreme Court then reviewed its decisions on the sixth amendment right to a jury from a cross-section of the community. The Supreme Court pointed out that *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457, held that where a defendant is charged with the commission of a Federal offense, under the sixth amendment the jury must be a body truly representative of the community and not the organ of any special group or class. The Supreme Court in *Taylor* further pointed out that because the defendant in *Ballard v. United States* (1946), 329 U.S. 187, 91 L. Ed. 2d 181, 67 S. Ct. 261, was convicted by a jury from

which women had been excluded and because the jury in *Ballard* should have been a cross-section of the community, the Supreme Court exercised its supervisory authority and reversed Ballard's conviction. The Supreme Court in *Taylor* reiterated that "[t]he unmistakable import of this Court's opinions *** is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." (*Taylor v. Louisiana* (1975), 419 U.S. 522, 528, 42 L. Ed. 2d 690, 697, 95 S. Ct. 692, 697.) The court further stated in *Taylor*:

> "[T]he requirement of a jury's being chosen from a fair cross section of the community is fundamental to the American system of justice. ***
>
> We accept the fair–cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment ***. The purpose of a jury is *** to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. [Citation.] This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. *** Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. 'Trial by jury presupposes a jury drawn from a pool broadly representative of the community *** as assurance of a diffused impartiality ***.' " 419 U.S. 522, 530, 42 L. Ed. 2d 690, 698, 95 S. Ct. 692, 697-98.

After holding that the sixth amendment right to a jury trial required that the jury venire be chosen from a cross-section of the community, the Supreme Court then held that women were included in that cross-section and that to systematically exclude them from jury service violated the sixth amendment. The court expounded in *Taylor*:

> "We are also persuaded that the fair–cross-section requirement is violated by the systematic exclusion of women ***. *** [I]f they are systematically eliminated from jury panels, the Sixth Amendment's fair–cross-section requirement cannot be satisfied. *** If the fair–cross-section rule is to govern the selection of juries, as we have concluded it must, women cannot be systematically excluded from jury panels from which petit juries are drawn. ***

* * *

\*\*\* [U]ntil today no case had squarely held that the exclusion of women from jury venires deprived a criminal defendant of his Sixth Amendment right to trial by an impartial jury drawn from a fair cross section of the community." 419 U.S. 522, 531-36, 42 L. Ed. 2d 690, 698-701, 95 S. Ct. 692, 698-700.

In the case at bar, the prosecutors' exercise of 16 of 17 peremptory challenges against women in the jury selection process constituted the systematic exclusion of women from the jury. Although there remained on the defendant's jury one woman, whom the defendant labeled a token, one woman on the jury did not constitute a reasonably fair cross-section of the community. The jury in the case at bar was almost totally male and it constituted almost total exclusion of women. The prosecutors systematically excluded a distinctive group in the community and the jury thereby failed to be reasonably representative thereof. The Supreme Court in *Taylor* addressed the jury, from which there had been almost total exclusion of women. The Supreme Court stated:

"Accepting as we do, however, the view that the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community, we think it is no longer tenable to hold that women as a class may be excluded or given automatic exemption based solely on sex *if the consequence is that criminal jury venires are almost totally male.* \*\*\* If at one time it could be held that Sixth Amendment juries must be drawn from a fair cross section of the community *but that this requirement permitted the almost total exclusion of women, this is not the case today.*" (Emphasis added.) 419 U.S. 522, 537, 42 L. Ed. 2d 690, 702, 95 S. Ct. 692, 701.

Although the Supreme Court stated in *Taylor* that it would not impose a requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population, the Supreme Court concluded, however, that:

"[T]he jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. 522, 538, 42 L. Ed. 2d 690, 703, 95 S. Ct. 692, 702.

In *Taylor*, women were systematically excluded from the jury venire by a provision of the Louisiana Constitution and Code which ultimately excluded them from the *petit jury actually chosen,* whereas in the case at bar, the women were systematically excluded from the

*petit jury actually chosen* by the prosecutor's systematic exercise of peremptory challenges against them.

In *Taylor*, the provision that a woman could not serve on a jury unless she filed a written declaration of her willingness to serve was invalidated. In *Duren v. Missouri* (1979), 439 U.S. 357, 58 L. Ed. 2d 579, 99 S. Ct. 664, the provision that a woman would be excused from jury service upon her written election not to serve was challenged. Duren's jury was selected from a 53-person panel on which there were five women. The 12 male jurors convicted Duren of murder and robbery. At the threshold of the *Duren* opinion, the Supreme Court stated: "In *Taylor v. Louisiana* (1975), 419 U.S. 522, [42 L. Ed. 2d 690, 95 S. Ct. 692,] this Court held that systematic exclusion of women during the jury-selection process, resulting in jury pools not 'reasonably representative' of the community, denies a criminal defendant his right, under the Sixth and Fourteenth Amendments, to a petit jury selected from a fair cross section of the community" and *"[a] criminal defendant has standing to challenge exclusion resulting in a violation of the fair–cross-section requirement, whether or not he is a member of the excluded class."* (Emphasis added.) (439 U.S. 357, 358-59, 359 n.1, 58 L. Ed. 2d 579, 583, 583 n.1, 99 S. Ct. 664, 666, 666 n.1.) In invalidating the aforementioned provision which excluded women from jury service and in reversing the conviction in *Duren*, the Supreme Court stated: *"Taylor* without any doubt established that women 'are sufficiently numerous and distinct from men' so that 'if they are systematically eliminated from jury panels, the Sixth Amendment's fair–cross-section requirement cannot be satisfied.' " 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587, 99 S. Ct. 664, 668.

The Supreme Court further stated in *Duren*: "We stress, however, that the constitutional guarantee to a jury drawn from a fair cross section of the community requires that States exercise proper caution in exempting broad categories of persons from jury service. *** [A]ny category expressly limited to a group in the community of sufficient magnitude and distinctiveness so as to be within the fair–cross-section requirement—such as women—runs the danger of resulting in underrepresentation sufficient to constitute a prima facie violation of that constitutional requirement."* (Emphasis added.) 439 U.S. 357, 370, 58 L. Ed. 2d 579, 590-91, 99 S. Ct. 664, 671.

In the case at bar, there is no reason discernible in the record for the prosecutor's systematic and purposeful exclusion of the female jurors. But, as the Supreme Court aptly stated in *Taylor v. Louisiana* (1975), 419 U.S. 522, 537, 42 L. Ed. 2d 690, 702, 95 S. Ct. 692, 701, and repeated in *Duren*: *"If it was ever the case that women were un-*

*qualified to sit on juries or were so situated that none of them should be required to perform jury service, that time has long since passed."* (Emphasis added.) *Duren v. Missouri* (1979), 439 U.S. 357, 369-70, 58 L. Ed. 2d 579, 590, 99 S. Ct. 664, 671.

The State simply argues in the case before us that the prosecutors' systematic and purposeful exclusion of women from jury service by exercise of peremptory challenges was permitted by *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202, *cert. denied* (1984), 469 U.S. 1028, 83 L. Ed. 2d 372, 105 S. Ct. 447, *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364, and *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824. The State contends that exclusion of women from the jury by the prosecutor's exercise of peremptory challenges in this single case did not constitute a denial of equal protection of the law under the fourteenth amendment and that the defendant must establish that the prosecutor systematically and purposefully excluded women from juries because of their sex by the exercise of peremptory challenges in a series of cases over an extended period of time. The State argues that because the defendant did not sustain this burden in the case at bar no constitutional violation occurred. The State further urges that the sixth amendment requirement that the jury be chosen from a fair cross-section of the community applied only to the jury venire and was inapplicable to the petit jury actually chosen.

In the spring of 1982, this court decided *People v. Payne* (1982), 106 Ill. App. 3d 1034, 436 N.E.2d 1046, in a scholarly opinion authored by Justice Dom Rizzi on behalf of a unanimous court. In *Payne*, the defendant contended that he was denied the type of fair trial guaranteed under the sixth amendment of the United States Constitution because the prosecutor on *voir dire* examination of the jurors exercised his peremptory challenges to systematically exclude blacks from the petit jury simply because they were black. In *Payne*, seven blacks were on the venire and were available as jurors during the *voir dire*. The prosecutor exercised eight peremptory challenges, six of which were used to eliminate six of the seven blacks. The prosecutor allowed the remaining black to become a juror. The court pointed out that it was aware that some prosecutors allowed a token black on some juries. The State in *Payne* defended the prosecutor's pernicious exclusion of blacks from the petit jury by the exercise of peremptory challenges under the authority of *Swain*—that the prosecutor's striking of blacks from a single petit jury did not violate the equal protection clause of the fourteenth amendment of the United

States Constitution.

Justice Rizzi pointed out in *Payne* that since *Swain* was decided in 1965, the Supreme Court held in 1968, for the first time, in *Duncan v. Louisiana* (1968), 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444, that the sixth amendment constitutional right to be tried by jury was made binding upon the States by the due process clause of the fourteenth amendment. Justice Rizzi pointed out further in *Payne* that 10 years after *Swain*, the Supreme Court stated in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692: "The background against which this case must be decided includes our holding in *Duncan v. Louisiana* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444, (1968), that the Sixth Amendment's provision for jury trial is made binding on the States \*\*\*," and "[w]e accept the fair–cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment." 419 U.S. 522, 526, 530, 42 L. Ed. 2d 690, 696, 698, 95 S. Ct. 692, 696, 697-98.) Justice Rizzi concluded that *Swain* was therefore inapplicable in *Payne*, that the *Taylor* rationale was applicable and that the sixth amendment conferred upon a criminally accused defendant the right to a jury comprised of a fair cross-section of the community and prohibited a prosecutor's defeating that right by exercising peremptory challenges to exclude blacks from the jury solely because they were blacks.

The court recognized in *Payne* that *Taylor* involved the systematic exclusion of women from the jury venire rather than from the jury *voir dire*, but discerned no rational distinction in allowing racial discrimination by the State in the latter but not the former. The court resolved:

> "The desired goal of interaction of a cross section of the community does not occur within the venire, but rather, is only effectuated by the petit jury that is selected and sworn to try the issues. It follows that the systematic exclusion of prospective jurors solely because of their race is equally invidious and unconstitutional at any stage of the jury selection, *i.e.,* from the time the general jury list is prepared by the jury commissioner until the jury is actually selected and sworn. If we were to hold otherwise, the constitutional right to a jury drawn from a fair cross section of the community could be rendered a nullity through the use of peremptory challenges. We would have to resort to casuistry to hold that a State may do at the *voir dire* selection of the jury what it is constitutionally precluded from doing at the venire selection of the jury." *People v. Payne* (1982), 106 Ill. App. 3d 1034, 1036-37, 436 N.E.2d 1046.

After this court's decision on May 19, 1982, in *Payne, McCray v. New York* (1982), 57 N.Y.2d 542, 443 N.E.2d 915, 457 N.Y.S.2d 441, was decided. In *McCray,* the black defendant was charged with the robbery of a white victim. The prosecutor exercised seven peremptory challenges to exclude all seven blacks from the jury. The all white jury convicted McCray. On appeal the New York Court of Appeals held that under *Taylor,* the sixth amendment required that the jury pool must be selected from a representative cross-section of the community and that distinctive groups in the community could not be systematically excluded from the pool, but that under the authority of *Swain,* once the jury pool was so selected, black prospective jurors may then be excluded by the prosecutor's exercise of peremptory challenges.

On denial of the petition for a writ of *certiorari* in *McCray v. New York* (1982), 57 N.Y.2d 542, 443 N.E.2d 915, 457 N.Y.S.2d 441, *cert. denied* (1983), 461 U.S. 961, 77 L. Ed. 2d 1322, 103 S. Ct. 2438, Justice Marshall, joined by Justice Brennan, dissented. Justice Stevens stated on denial of McCray's petition, joined by Justice Blackman and Justice Powell: "My vote to deny certiorari in these cases does not reflect disagreement with Justice Marshall's appraisal of the importance of the underlying issue—whether the Constitution prohibits the use of peremptory challenges to exclude members of a particular group from the jury \*\*\*." (461 U.S. 961, 77 L. Ed. 2d 1322, 103 S. Ct. 2438.) Justice Stevens simply thought that the court should "allow the various States to serve as laboratories in which the issue receives further study before it is addressed by this Court." 461 U.S. 961, 963, 77 L. Ed. 2d 1322, 1323, 103 S. Ct. 2438, 2439.

Justice Marshall's dissent pointed out that the trial court and the court of appeals in *McCray* relied heavily on *Swain.* Justice Marshall stated: "In *Swain,* a closely divided court held that the prosecutor's use of peremptory challenges to strike Negroes from the jury panel in one particular case did not deny the defendant the equal protection of the laws." (461 U.S. 961, 964, 77 L. Ed. 2d 1322, 1323, 103 S. Ct. 2438, 2440.) Justice Marshall insisted that *Swain* was wrongly decided. He stated that he "would grant certiorari to reexamine the standard set forth in *Swain,*" for the reasons that, "[i]n the nearly two decades since it was decided, *Swain* has been the subject of almost universal and often scathing criticism. Since *every* defendant is entitled to equal protection of the laws and should therefore be free from the invidious discrimination of State officials, it is difficult to understand why several must suffer discrimination because of the prosecutor's use of peremptory challenges before any defendant can object.

Moreover, *Swain* is inconsistent with the rule established in other jury selection cases ***. [T]he standard of proof for discrimination in *Swain* imposes a nearly insurmountable burden on defendants." (461 U.S. 961, 964-65, 77 L. Ed. 2d 1322, 1324, 103 S. Ct. 2438, 2440-41.) Justice Marshall accurately emphasized that, "The right to a jury drawn from a fair cross section of the community is rendered meaningless if the State is permitted to utilize several peremptory challenges to exclude all Negroes from the jury." (461 U.S. 961, 967, 77 L. Ed. 2d 1322, 1325, 103 S. Ct. 2438, 2442.) He concluded:

> "Accordingly, I would grant certiorari to consider whether petitioners' Sixth Amendment rights, as applied to the States through the Fourteenth Amendment, were violated by the prosecutors' use of peremptory challenges to exclude all Negroes from the juries in these three cases. Sixth Amendment principles have evolved significantly since *Swain* was decided, and it is time to reexamine whether the rule announced in *Swain* under the Equal Protection Clause can be reconciled with the Sixth Amendment right of every defendant." 461 U.S. 961, 969-70, 77 L. Ed. 2d 1322, 1326, 103 S. Ct. 2438, 2443.

Also, after this court's decision in *Payne,* the supreme court of Illinois decided *People v. Williams* (1983), 97 Ill. 2d 252, 454 N.E.2d 220, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364. In *Williams,* the black defendant was sentenced to death by an all white jury, from which blacks had been excluded by the prosecutor's exercise of peremptory challenges. The Illinois Supreme Court held that the 1975 decision of the Supreme Court of the United States in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, did not retreat from the view that it is an essential part of trial by an impartial jury that both sides be allowed to exercise peremptory challenges on any ground they select, that *Taylor* only addressed the systematic exclusion of women from the jury venire, that *Taylor* did not invalidate the systematic exclusion of blacks from the petit jury by the prosecutor's exercise of peremptory challenges. The Illinois Supreme Court in *Williams* relied on *McCray v. New York* (1982), 57 N.Y.2d 542, 545, 443 N.E.2d 915, 916, 457 N.Y.S.2d 441, 442-43, *cert. denied* (1983), 461 U.S. 961, 77 L. Ed. 2d 1322, 103 S. Ct. 2438, and affirmed the defendant's conviction and the jury's imposition of the death penalty.

Shortly after the Illinois Supreme Court decided *Williams,* it reversed this court's decision in *Payne* and held in *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202, *cert. denied* (1984), 469 U.S. 1028, 83 L. Ed. 2d 372, 105 S. Ct. 447: "Because *Taylor's* concern

had been with a sixth amendment right to a 'fair cross-section of the community on venires, panels, or lists from which petit jurors were drawn' [citation], we concluded that *Taylor* had not diminished *Swain's* precedential value. \*\*\* Since the issue in *Williams* concerned only the alleged exclusion[s] of blacks in that case, and *Swain* specifically permitted the use of peremptory challenges for that purpose, we found no error occurred. We made clear our agreement with the *Swain* principle that an essential part of our jury trial system is the right of both sides in particular cases to exercise peremptory challenges as they deem advisable, and our belief that this principle was unaffected by *Taylor's* announcement of a sixth amendment right to 'a fair cross section of the community' on sources from which petit jurors are drawn." (99 Ill. 2d 135, 138-39, 457 N.E.2d 1202.) Thus, this court's contrary holding in *Payne* was short-lived.

Justice Clark specially concurred with the majority in *Payne* on the ground that the systematic exclusion of blacks from Payne's jury was not proven. Justice Clark stated that such exclusion would have been unconstitutional if it had been proven. Justice Clark in *Payne* expressly agreed with the arguments advanced in Justice Simon's dissent. (99 Ill. 2d 135, 139, 457 N.E.2d 1202.) Justice Clark significantly added: "[T]he judiciary must be vigilant to avoid the systematic exclusion of blacks from jury duty \*\*\*" and that *"the systematic exclusion of any group based on sex or ethnicity is equally repugnant."* (Emphasis added.) 99 Ill. 2d 135, 140, 457 N.E.2d 1202.

Justice Simon stated in *Payne* that the use of peremptory challenges to exclude black jurors solely because of their race denied the defendant his constitutional rights to equal protection of the laws and to a trial by a fair and impartial jury drawn from a cross-section of his community. Justice Simon pointed out that *Swain* did not involve whether the use of peremptory challenges to exclude black jurors violated the sixth amendment because the sixth amendment had not been held to be applicable to the States when *Swain* was decided. Justice Simon posited that the use of peremptory challenges to exclude blacks from jury service violated the sixth amendment for the same reason that the venire selection system in *Taylor*, which excluded women from the jury venire except where they volunteered, likewise violated the sixth amendment. He pointed out that the intentional exclusion of black jurors by the exercise of peremptory challenges prevented blacks as a group from jury participation in the same way as did the jury venire selection system in *Taylor*. Justice Simon concluded in *Payne*: "Peremptory challenges \*\*\* are entitled to no more deference in constitutional analysis than any other device used by

State officials to exclude persons from jury service on the basis of race, sex, religion or national origin. To the extent that the practice is unconstitutional under the sixth amendment, any conviction obtained through its use is void." Justice Simon also stated: "Any deliberate exclusion of all members of a group from participating on a jury violates the sixth amendment whether it occurs at the *voir dire* or when the members of the venire are selected." 99 Ill. 2d 135, 143-44, 147, 457 N.E.2d 1202.

As Justice Thurgood Marshall had insisted in *McCray*, Justice Simon also insisted in *Payne* that *Swain* was wrongly decided because its requirement that a defendant establish the systematic exclusion of black jurors in case after case imposed an impossible burden on the individual defendant. Additionally, Justice Simon listed the titles and citations of the "shocking number" of 33 cases in this State in which defendants alleged injustices under *Swain* by the prosecutors' use of peremptory challenges to exclude blacks from the juries that convicted them. (99 Ill. 2d 135, 152-53, 457 N.E.2d 1202.) This court in *People v. Gosberry* (1982), 109 Ill. App. 3d 674, 682-83, 440 N.E.2d 954, likewise listed the titles and citations of 28 cases in which this issue was raised on appeal.

It is appropriate to extensively discuss herein this court's *Payne* decision and Justice Rizzi's persuasive analysis and rejection of *Swain*, even though the decision was reversed by the Illinois Supreme Court. Justice Simon's compelling dissent and his similar analysis and rejection of *Swain* in *Payne* is also relevantly quoted herein for the reason that the Supreme Court of the United States belatedly recognized but candidly admitted on April 30, 1986, in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, that *Swain* was wrongly decided and overruled it and its progeny. Thus, the authority of this court's unanimous holding in *Payne*, which was overruled by the Illinois Supreme Court in reliance on *Swain*, and Justice Simon's dissenting opinion in *Payne* were revived and revitalized by *Batson* and its overruling of *Swain*.

*Batson* and *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 90, 95 S. Ct. 692, prohibit the systematic and purposeful elimination of women from jury service by a prosecutor's exercise of peremptory challenges because such exclusion violates the defendant's sixth amendment constitutional right to a jury composed of a representative fair cross-section of the community and the defendant's fourteenth amendment constitutional right to the equal protection of the laws.

In *Batson*, the defendant, a black man, was indicted in Kentucky

for second-degree burglary and receipt of stolen property. The racial or sexual identity of the owner of the burglarized premise or stolen property was not revealed. During the jury selection the trial judge conducted the initial *voir dire* examination of the venire and excused some of the jurors for cause. Thereafter, the prosecutor and defense attorney were permitted to exercise their peremptory challenges. The prosecutor exercised his peremptory challenge to strike all four blacks in the venire. An all white jury was selected. The defense counsel moved to discharge the jury. He urged that the prosecutor's removal of all the black members of the venire by the exercise of peremptory challenges violated the defendant's sixth and fourteenth amendment constitutional rights to a jury drawn from a cross-section of the community, and his fourteenth amendment right to equal protection of the law. After stating that the prosecutor was entitled to use his peremptory challenge to strike any venire he chose, the trial judge denied the defendant's motion to discharge the all white jury. The jury convicted the defendant and the supreme court of Kentucky affirmed.

The Supreme Court of the United States held that the equal protection clause of the fourteenth amendment guaranteed the defendant that the State could not exclude persons of his race from the jury venire on account of race and that the State's exclusion of a person from a jury simply because of race also unconstitutionally discriminated against the excluded juror. The Supreme Court further held that the equal protection principle which prohibited discrimination against blacks in selecting the jury venire also prohibited the State's use of its peremptory challenges to strike black jurors from the petit jury because of their race.

The Supreme Court eliminated the *Swain* requirement that the defendant establish the prosecutor's systematic and purposeful exclusion of blacks from jury service in a series of cases over an extended period of time and held that a defendant may establish a *prima facie* case of purposeful discrimination by showing the prosecutor's use of peremptory challenges against blacks at the defendant's trial. To do so, the Supreme Court held, the defendant must first show that he is a member of a cognizable racial group and that the prosecutor exercised his peremptory challenges to remove from the venire members of the defendant's race. Once the defendant has established a *prima facie* showing of purposeful discrimination, the burden then shifts to the prosecutor to establish a neutral explanation for his peremptory challenge of the black jurors. The Supreme Court in *Batson* remanded for further proceedings and directed that if the prosecutor failed to establish a neutral explanation for his peremptory exclusion of the

black jurors, the defendant's conviction was to be reversed.

It follows from *Batson* and *Taylor* that a prosecutor's use of peremptory challenges to purposefully and systematically exclude females from jury service simply because they are women is prohibited. When, as in the case at bar, the prosecutor has done so and does not come forward with a neutral explanation for excusing the female jurors, the defendant's equal protection guarantee that the State will not exclude females from the jury because of their sex has been violated. Likewise, the systematic exclusion of women because of their sex from the defendant's jury by the prosecutor's exercise of peremptory challenges violated the defendant's sixth amendment constitutional right to a fair and impartial jury of a fair cross-section of the community. The exclusion also unconstitutionally discriminated against the excluded female jurors.

On May 5, 1986, five days after the *Batson* decision, the Supreme Court of the United States decided *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758. McCree was charged with a robbery-murder, a capital offense. On *voir dire*, under *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the trial judge *Witherspooned* the jury and excused for cause all prospective jurors who stated that they could not under any circumstances vote for imposition of the death penalty, "so-called '*Witherspoon*-excludables.'" The all pro-death penalty jury convicted McCree of felony murder.

McCree contended before the Supreme Court of the United States that the removal for cause from his jury those jurors who were unalterably opposed to the death penalty, the *Witherspoon*-excludables, during the innocence or guilt phase of his trial violated his right under the sixth and fourteenth amendments to have his innocence or guilt determined by an impartial jury of a representative cross-section of the community. He urged that the community was comprised of persons who were and persons who were not unconditionally opposed to the death penalty and that his jury, from which for cause all of the former group were excluded, therefore was not a representative fair cross-section of the community.

The five-member majority of the Supreme Court in *McCree* reasoned that a prospective juror who was unconditionally opposed to and who under no circumstances would impose the death penalty was a juror who could not follow the law by imposing the death penalty in an appropriate case. The majority further reasoned that the State was entitled to a jury composed of all persons who would follow the law and that the defendant was not entitled to a jury composed of any

person who would not. The court stated: " *'Death qualification,' unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest* in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phase of a capital trial" and *"[u]nlike blacks, women, and Mexican-Americans, 'Witherspoon-excludables' are singled out for exclusion in capital cases on the basis of an attribute that is within the individual's control"* and the "*Witherspoon*-excludables \*\*\* are treated no differently than any juror who expresses the view that he would be unable to follow the law in a particular case." (Emphasis added.) *Lockhart v. McCree* (1986), 476 U.S. 162, 175-76, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766.

The majority declined to adopt McCree's contention that the sixth amendment representative fair cross-section of the community jury requirement compelled inclusion on his petit jury "*Witherspoon*-excludables," members of the community group who were unalterably opposed to the death penalty. The majority concluded: *"The essence of a 'fair cross-section' claim is the systematic exclusion of 'a "distinctive" group in the community.'* [Citation.] In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the '*Witherspoon*-excludables' at issue here, are not 'distinctive groups' for fair cross-section purposes. \*\*\* In sum, '*Witherspoon*-excludables,' or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement. [Citation.] ('Nothing in *Taylor*, however, suggests that the right to a representative jury includes the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge'). It is for this reason that we conclude that '*Witherspoon-excludables' do not constitute a 'distinctive group' for fair cross-section purposes, and hold that 'death qualification' does not violate the fair cross-section requirement."* (Emphasis added.) 476 U.S. 162, 174-77, 90 L. Ed. 2d 137, 148-50, 106 S. Ct. 1758, 1765-66.

Although the Supreme Court in *McCree* held that "*Witherspoon*-excludables" were not a distinctive group for sixth amendment community cross-section purposes, the court, however, repeatedly pointed out that blacks, *women* and Mexican-Americans were such distinctive groups. The court further stated in *McCree*: "Our prior jury represen-

tativeness cases, whether based on the fair cross-section component of the Sixth Amendment or the Equal Protection Clause of the Fourteenth Amendment have involved such groups as blacks, see *Peters v. Kiff,* 407 U.S. 493, 33 L. Ed. 2d 83, 92 S. Ct. 2163 (1972) (plurality opinion) (equal protection), *women,* see *Duren, supra* (fair cross-section); *Taylor, supra* (same), and Mexican-Americans, see *Castaneda v. Partida,* 430 U.S. 482, 51 L. Ed. 2d 498, 97 S. Ct. 1272 (1977) (equal protection). *The wholesale exclusion of these large groups from jury service clearly contravened all three of the aforementioned purposes of the fair cross-section requirement.* Because these groups were excluded for reasons completely unrelated to the ability of members of the group to serve as jurors in a particular case, the exclusion raised at least the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community. In addition, *the exclusion from jury service of large groups of individuals not on the basis of their inability to serve as jurors, but on the basis of some immutable characteristic such as race, gender, or ethnic background, undeniably gave rise to an 'appearance of unfairness.' Finally, such exclusion improperly deprived members of these often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases."* (Emphasis added.) *Lockhart v. McCree* (1986), 476 U.S. 162, 175, 90 L. Ed. 2d 137, 149, 106 S. Ct. 1758, 1765-66.

*McCree* quoted *Pope v. United States* (8th Cir. 1967), 372 F.2d 710, 725, which held: " 'The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn,' *vacated on other grounds,* 392 U.S. 651, 88 S. Ct. 2145, 20 L. Ed. 2d 1317 (1968)." (*Lockhart v. McCree* (1986), 476 U.S. 162, 174, 90 L. Ed. 2d 137, 148, 106 S. Ct. 1758, 1765.) This is not to say, however, that at the point at which the names are put in the box from which the panels are drawn is also the point at which a defendant's sixth amendment right to a jury of a fair cross-section of the community ends. The majority's statement in *Mc-Cree,* that "[w]e remain convinced that an extension of the fair cross-section requirement to petit juries would be unworkable and unsound and we decline McCree's invitation to adopt such an extension," was a refusal by the court to extend "*Witherspoon*-excludables" to the sixth amendment community fair–cross-section requirement to petit juries. (476 U.S. 162, 174, 90 L. Ed. 2d 137, 148, 106 S. Ct. 1758, 1765.) It was not meant to authorize a prosecutor's exercise of peremptory challenges to systematically exclude women simply because of their sex from the sixth amendment community fair–cross-section

petit jury.

The Supreme Court held in *Batson* that a defendant's fourteenth amendment right to equal protection of the laws prohibited a prosecutor from exercising peremptory challenges to systematically and purposefully exclude and discriminate against blacks, a distinguishable community group. It cannot be persuasively argued that neither the sixth amendment right to a community fair–cross-section jury nor the fourteenth amendment right to equal protection of the laws prohibits a prosecutor from exercising peremptory challenges to systematically exclude women from the petit jury solely because of their sex. It cannot be logically argued that, while the sixth amendment prohibits the systematic exclusion of women and blacks from the jury venire and while the equal protection clause of the fourteenth amendment prohibits the purposeful and systematic exclusion of blacks from a petit jury by the prosecutor's use of peremptory challenges on the trial of a black defendant, yet, neither of these constitutional provisions likewise forbids a prosecutor's purposeful and systematic exclusion of women because of their sex from a petit jury by his use of peremptory challenges. It is fallacious to contend that the sixth and fourteenth amendments prohibit a prosecutor from discriminating against women because of their sex in the jury venire selection process but that neither amendment prohibits a prosecutor from discriminating against women in the selection of the petit jury from that venire. It is illogical to argue that a prosecutor may not discriminate against women because of their sex in the selection of the jury pool or venire but that he may discriminate against women in the selection of the petit jury which will decide the case. It is ludicrous to conclude that a prosecutor cannot discriminate against women because of their sex when calling jurors into the jury box for jury selection but that he may immediately thereafter discriminate against them because of their sex once they are there. Such discrimination by a prosecutor is reprehensible and does not give even lip service to the constitutional guarantee of equality to the women of this nation or to the Constitution which we now honor and pay homage. Such a prosecutorial tactic causes our bicentennial constitutional celebration to become a meaningless, cosmetic and whimsically aesthetic ritual.

In the recent May 11, 1987, decision of the United States Court of Appeals for the Seventh Circuit in *Teague v. Lane* (7th Cir. 1987), 820 F.2d 832, the defendant complained that the prosecutor exercised his peremptory challenges to systematically exclude blacks from his petit jury. The court held that the community fair–cross-section requirement of the sixth amendment was applicable to the jury pool from

which the petit jury was selected but that it was not applicable to the petit jury ultimately selected. The court, however, did not hold in *Teague* that the sixth amendment right to trial by jury or the fourteenth amendment right to equal protection did not prohibit a prosecutor's systematic exclusion of women from jury service by the use of peremptory challenges simply because of their sex.

Moreover, the dissenting opinion of Judge Cudahy, in which Judge Cummings concurred, suggests that the majority in *Teague* had not fully accepted that the Supreme Court in *Batson* overruled *Swain.* Judge Cudahy's dissent in *Teague* pointed out that *"Batson* itself is thus on all fours procedurally with *Teague"* and that *"Batson* completely demolishes the majority's arguments based on policy. In this respect, the majority opinion is little more than a compendium of outmoded views." (820 F.2d 832 (Cudahy, J., dissenting).) Judge Cudahy further stated: "The majority does not really address why it believes that the exercise of peremptory challenges solely on the basis of a juror's race does not violate the sixth amendment. Instead, it seems to rest its opinion on the practical problems involved in restricting the exercise of peremptory challenges. \*\*\* The problem I find with the majority opinion is that the Supreme Court in *Batson* has already rejected the argument that the exercise of peremptory challenges cannot be policed without destroying the effectiveness of the challenges. The majority is thus pursuing a contention that is unrelated to any particular constitutional doctrine and which has been thoroughly discredited by the Supreme Court in *Batson." 820 F.2d 832 (Cudahy, J., dissenting).

The majority's reliance on *Buchanan v. Kentucky* (1987), 483 U.S. ____, 97 L. Ed. 2d 336, 107 S. Ct. 2906, in the case at bar is misplaced. The Supreme Court stated that the question presented in *Buchanan* was whether the defendant was denied an impartial jury, representative of a fair cross-section of the community when the prosecutor excluded, for cause, *Witherspoon*-excludables from the jury in the defendant's joint trial with the codefendant, in which the death penalty was sought against only his codefendant. The court pointed out in *Buchanan* that *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758, held (1) that the Constitution does not prohibit the removal for cause of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial; (2) that contrary to McCree's contention, the death-qualified jury did not violate McCree's sixth and fourteenth amendment rights to an impartial jury selected from a representative

cross-section of the community; and (3) that the court's decision in *McCree* controlled the issue presented in *Buchanan.* (*Buchanan v. Kentucky* (1987), 483 U.S. ____, ____, 97 L. Ed. 2d 336, 350-51, 107 S. Ct. 2906, 2914.) The Supreme Court further reasoned in *Buchanan*:

> "In 'death qualifying' the jury at petitioner's joint trial, the Commonwealth did not arbitrarily single out the '*Witherspoon-*excludables' for a reason unrelated to their ability to serve as jurors at the trial, as, for example, on the basis of race or *gender.* See *id.* at ____, 90 L. Ed. 2d 137, 106 S. Ct. 1758. Rather, the Commonwealth excluded them in order to promote its interest in having a jury that could properly find the facts and apply the law at both the guilt and sentencing phases of the joint trial. Moreover, as was observed in *McCree*, the identification of a group such as the '*Witherspoon-*excludables' does not 'create an "appearance of unfairness," ' *id.*, at ____, 90 L. Ed. 2d 137, 106 S. Ct. 1758, because it is related to the Commonwealth's legitimate interest in obtaining a jury that does not contain members who are unable to follow the law with respect to a particular issue in a capital case. Similar reasoning applies in the context of petitioner's joint trial, for the '*Witherspoon-*excludables' would not have been able to assess properly the appropriateness of imposing the death penalty on codefendant Stanford.
>
> \* \* \*
>
> The facts of the case at bar do not alter the conclusion that '*Witherspoon-*excludables' are not a distinctive group for fair cross section purposes. Thus, there is no violation of the Sixth Amendment's fair cross section requirement here." (*Buchanan v. Kentucky* (1987), 483 U.S. ____, ____, 97 L. Ed. 2d 336, 350-51, 107 S. Ct. 2906, 2914.)

*Buchanan* is no authority for the majority's rejection in the case at bar of the defendant's claimed violation of his sixth amendment right to a jury composed of a representative fair cross-section of the community and his fourteenth amendment right to equal protection of the law. *McCree* and *Buchanan* simply held that the sixth amendment requirement that a defendant's jury be drawn from a fair representative cross-section of the community did not prohibit the exclusion from the petit jury persons who were unalterably opposed to and who would not impose the death penalty, *i.e., Witherspoon-*excludables. The defendant in the case at bar, for all practical purposes, was tried by a male *Witherspooned* jury, from which women were systematically excluded simply because they were women. The defendant in the case at

bar does not complain because he was not tried by a jury which contained *Witherspoon*-excludables, as did *Buchanan* and *McCree*. Rather, the defendant's complaint here is that he was tried by a jury from which there was systematically excluded an identifiable group, women, who were not *Witherspoon*-excludables or otherwise excludable. *Buchanan* and *McCree* do not hold that a prosecutor may systematically exclude non-*Witherspoon*-excludables who are women from a defendant's jury by the exercise of peremptory challenges. Nor do *Buchanan* and *McCree* hold that a prosecutor's doing so does not violate the defendant's sixth amendment right to a jury composed of a fair representative cross-section of the community or his fourteenth amendment equal protection right. *Buchanan* and *McCree* do not hold that a prosecutor's exercise of peremptory challenges to systematically exclude women from jury service simply because of their sex does not violate the defendant's sixth amendment right to a jury composed of a fair cross-section of the community or the defendant's fourteenth amendment right to the equal protection of the laws.

The majority's reliance on *People v. Zayas* (1987), 159 Ill. App. 3d 554, in the case at bar is also ill-founded. First, *Zayas* did not involve the prosecutor's exercise of peremptory challenges to systematically exclude women from jury service simply because of their sex. Second, in *Zayas*, the defendant was an "Hispanic" male. He contended on appeal that the prosecutor improperly exercised his peremptory challenges to systematically exclude 14 of 15 blacks and the sole Hispanic from the jury, in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. The court held in *Zayas*: "[U]nder the express holding of *Batson* [the Hispanic] defendant lacks standing to challenge the exclusion of blacks from the jury. The *Batson* court held that to establish such a case 'the defendant must first show that he is a *member of a cognizable racial group,* [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire *members of the defendant's race.*' *** Accordingly, we find that [the Hispanic] defendant lacks standing to challenge the State's partial exclusion of blacks from this jury." (Emphasis in original.) 159 Ill. App. 3d 554, 560.

Hispanic Americans, like black Americans, vary in complexion from ebony to alabaster. Moreover, Hispanic Americans, also like black Americans, vary in other physical racial identification characteristics, such as facial features, and color and texture of hair. The term "Hispanic" does not identify race. There are white Hispanic Americans and there are black Hispanic Americans, and the opinion in *Zayas* does not reveal which the defendant was. *Zayas* is a flawed ap-

plication of *Batson*.

Third, *Zayas* is not final authority. Zayas' petition for leave to appeal was granted on October 20, 1987, by the Illinois Supreme Court, where the cause is now pending and awaiting review and decision by that court. *People v. Zayas* (Oct. 20, 1987), Docket No. 65701.

Fourth, in *People v. Fields* (1987), 732 P.2d 1145, the supreme court of Colorado held that a black defendant had standing under the Federal and the State constitutional right to a jury to challenge the systematic exclusion of Hispanics from the jury by the prosecution's exercise of peremptory challenges. In *People v. Trevino* (1985), 39 Cal. 3d 667, 704 P.2d 719, 217 Cal. Rptr. 652, the prosecutor exercised his peremptory challenges to exclude six Spanish surnamed individuals from the jury and no Spanish surnamed person was chosen to serve on the jury, which convicted the defendant of murder. The supreme court of California, in setting aside the defendant's conviction because of the denial of his State constitutional right to a jury from a representative cross-section of the community, expounded the principles which govern the prosecutor's conduct in a criminal prosecution:

"Responsibility for the preservation of a defendant's cross-sectional rights does not fall exclusively on the shoulders of the court overseeing the selection of the petit jury. The prosecutor also shares in that responsibility.

The prosecutor's role is a unique one within the criminal justice system. Though the district attorney must diligently discharge the duty of prosecuting individuals accused of criminal conduct, the prosecutor may not seek victory at the expense of the defendant's constitutional rights. [Citations.] Thus, the prosecution is obligated to respect the defendant's right to a fair and impartial trial in compliance with due process of law.
\*\*\*

The prosecutor's dual role, as the defendant's adversary and as a guardian of the defendant's constitutional rights, extends to the prosecutor's use of peremptory challenges to exclude individuals from the jury. The prosecutor is free to use the statutorily provided peremptory challenges in any manner he or she chooses, so long as that use does not obstruct the defendant's constitutional rights. [Citations.] \*\*\* [U]se of peremptory challenges against jurors on the ground of group bias alone violates the right to a jury drawn from a representative cross-section of the community. [Citation.] The prosecutor must be ever watchful to insure that in his or her conscientious efforts to efficiently discharge official duties the statutory right to perempto-

rily challenge jurors is not exalted over the defendant's constitutional right to a jury drawn from a representative cross-section of the community. [Citations.]

The prosecutor further shares responsibility for protecting the accused's cross-sectional rights because he or she acts on behalf of the state in conducting criminal prosecutions. [Citations.] *** In all his activities, his duties are conditioned by the fact that he 'is the representative not of any ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all ***. [Citation.] Thus, the prosecutor must execute the duties of this representative office diligently and fairly, avoiding even the appearance of impropriety that might reflect poorly on the state.

In the context of jury selection, the prosecutor must take care to exercise peremptory challenges for legitimate purposes only, ever mindful of the prosecutor's role as a representative of the state. The use of group stereotypes as the sole criterion for the exercise of these challenges not only violates the defendant's constitutional rights, but attributes discriminatory intent to the state as well, detracting from the legitimacy of the state-imposed process. *** '[P]art of the function of the jury is to ensure that the public will feel its conscience is reflected in the verdict ***. To allow the prosecutor to exercise peremptory challenges based on group affiliation alone casts a shadow on the appearance of integrity which must of necessity underlie public identification with the verdict.' [Citation.] The prosecutor, as an officer of the state, must take extra pains to insure that use of peremptory challenges does not result in a violation of an accused's right to be tried by a jury drawn from a representative cross-section of the community. The courts, in turn, must be vigilant in seeing to it that prosecutors do not overstep the constitutional bounds of the cross-section requirement in selecting members of the jury." 39 Cal. 3d 667, 680-82, 704 P.2d 719, 724-26, 217 Cal. Rptr. 652, 657-59.

In the case at bar the prosecutors, Jay Magnuson and Thomas O'Donnell, did not adhere to these fundamental principles enunciated in *Trevino,* but instead they flagrantly violated them. Their sexist conduct should not be condoned by the courts but rather, their anti-feminist tactics should be resoundingly denounced and condemned.

As the Colorado and California supreme courts effectively held in *Fields* and *Trevino,* States may confer a broader constitutional right

than that conferred by a comparable provision of the United States Constitution. The holding of the majority in *People v. Tisler* (1984), 103 Ill. 2d 226, 243-45, 469 N.E.2d 147, is not contrary, but rather is in accord. Justice Simon stated in his dissent in *Payne* that even if the sixth and fourteenth amendments to the United States Constitution allowed State prosecutors to exercise peremptory challenges to exclude blacks from jury service simply because they were black, the Illinois Supreme Court had an obligation to enforce State constitutional prohibitions as to the defendant's claim and that in interpreting and enforcing the Illinois Constitution the Illinois Supreme Court was not bound by precedents of the United States Supreme Court. Justice Simon further stated in *Payne* that he interpreted article I, section 13, of the Illinois Constitution to guarantee to each criminal defendant a trial by an impartial jury selected from a fair cross-section of the community in which he is tried and that the prosecutor's use of peremptory challenges to exclude blacks from the jury simply because they were blacks violated the State Constitution. *People v. Payne* (1983), 99 Ill. 2d 135, 155-56.

In *Pruneyard Shopping Center v. Robins* (1980), 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035, the California Supreme Court held that the California constitution protects the right of free speech even on the property of a privately owned shopping center and did not violate the shopping center owner's property rights protected by the Federal Constitution. The Supreme Court of the United States unanimously affirmed and stated: "Our reasoning in [*Lloyd Corp. v. Tanner* (1972), 407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219], however, does not *ex proprio vigore* limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." (447 U.S. 74, 81, 64 L. Ed. 2d 741, 752, 100 S. Ct. 2035, 2040.) Mr. Justice Marshall's concurring opinion states: "I applaud the [California supreme] court's decision, which is a part of a very healthy trend of affording state constitutional provisions a more expansive interpretation than this Court has given to the Federal Constitution." 447 U.S. 74, 91, 64 L. Ed. 2d 741, 758, 100 S. Ct. 2035, 2046.

In holding that the search of the defendant's car, which by law had been impounded and held as evidence for forfeiture proceedings, did not violate the fourth amendment prohibition against unreasonable search and seizure, the Supreme Court in *Cooper v. California* (1967), 386 U.S. 58, 62, 17 L. Ed. 2d 730, 734, 87 S. Ct. 788, 791, stated: "Our holding, of course, does not affect the State's power to

impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so."

In *People v. Van Cleve* (1982), 89 Ill. 2d 298, 307, 432 N.E.2d 837, the supreme court of Illinois held that article VI, section 6, of the Illinois Constitution, which provides "that after a trial on the merits in a criminal case, there shall be no appeal from a judgment of acquittal" (Ill. Const. 1970, art. VI, sec. 6), was designed to provide rights and protections in addition to and above those rights and protections provided in the double jeopardy clause of article I, section 10, of the Illinois Constitution.

In *United States v. Miller* (1976), 425 U.S. 435, 48 L. Ed. 2d 71, 96 S. Ct. 1619, the defendant contended that his bank records had been illegally seized by *subpoenas duces tecum* in violation of his fourth amendment constitutional right to be secure in his papers and effects against unreasonable search and seizure. The Supreme Court held that the defendant possessed no private interest in the bank records and lacked standing under the fourth amendment to challenge the subpoena. Nevertheless, the defendant argued in *People v. Jackson* (1983), 116 Ill. App. 3d 430, 452 N.E.2d 85, that although under *Miller* she may not have a right to privacy in her bank records under the fourth amendment to give her standing to quash a *subpoena duces tecum* for her bank records and to suppress her bank records seized in execution of the subpoena, the defendant urged that she had a right to privacy in her bank records and that she had standing to quash a *subpoena duces tecum* and suppress evidence under article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, sec. 6). This court agreed and held: "A State may of course set a higher standard of rights than the comparable United States constitutional right." 116 Ill. App. 3d 430, 433, 452 N.E.2d 85.

*People v. Weissinger* (1980), 90 Ill. App. 3d 700, 413 N.E.2d 497, held that the Illinois Motor Vehicle Code (Ill. Rev. Stat. 1977, ch. 95½, par. 11—501(c)(3)), which provides that evidence of a chemical analysis of a defendant's blood for alcoholic content was inadmissible against the defendant unless the defendant's blood was obtained from him with his consent, was intended to confer a greater protection than the constitutional privilege against self-incrimination. Ill. Const. 1970, art. I, sec. 10.

The Supreme Court held in *Schmerber v. California* (1966), 384 U.S. 757, 16 L. Ed. 2d 908, 86 S. Ct. 1826, that the officers' nonconsensual extraction of the defendant's blood for chemical alcohol analysis did not violate the defendant's fifth amendment constitutional right against self-incrimination.

The Illinois Appellate Court cited *Weissinger, Schmerber* and the consent requirement of the Illinois Motor Vehicle Code in *People v. Hoffner* (1981), 99 Ill. App. 3d 516, 425 N.E.2d 603, where the trial court suppressed the result of a blood test because the defendant's blood was obtained without consent. The court held that in spite of the Supreme Court's contrary holding in *Schmerber,* "[T]he State of Illinois, or any other sovereign State, may provide individual protection where the Constitution of the United States does not protect the individual or may expand upon the constitutional rights already provided to individuals." 99 Ill. App. 3d 516, 518, 425 N.E.2d 603; see also J. Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489 (1977); J. Feldman, *A Data Sampler of Constitutions,* Nat'l L.J. (March 12, 1984).

Even before the United States Supreme Court in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 69, overruled *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890, held, "We have reviewed this line of United States Supreme Court opinions in some detail because we fully agree with the views there expressed as to the importance of the `representative cross-section rule, particularly in protecting the constitutional right to an impartial jury. We rely equally, however, on the law of California. It was not until its 1975 decision in *Taylor* that the high federal court imposed the representative cross-section rule on the states as a fundamental component of the Sixth Amendment right to an impartial jury incorporated in the Fourteenth Amendment. In California we had long since adopted that rule."

The Supreme Court of California in *Wheeler* concluded: "[T]he use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution. This does not mean that the members of such a group are immune from peremptory challenges: individual members thereof may still be struck on grounds of specific bias, as defined herein. Nor does it mean that a party will be entitled to a petit jury that proportionately represents every group in the community: we adhere to the long-settled rule that no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed is composed of any particular individuals. [Citations.] *What it does mean, however, is that a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the com-*

*munity as the process of random draw permits."* (Emphasis added.) (22 Cal. 3d 276-77, 583 P.2d 748, 761-62, 148 Cal. Rptr. 890, 903.) *People v. Hall* (1983), 35 Cal. 3d 161, 672 P.2d 854, 197 Cal. Rptr. 71, and *Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, hold the same.

No legitimate interest of the State is protected or pursued in a criminal case by the prosecutor's exercise of peremptory challenges to purposefully and systematically exclude women from jury service simply because of their sex. Such exclusion unconscionably discriminates against women and denies the equal protection of the laws guaranteed by article I section 2, of the Constitution of the State of Illinois. The Supreme Court of the United States so held in *Batson* when the court stated:

> "In *Strauder [v. West Virginia* (1880), 100 U.S. (10 Otto) 303, 25 L. Ed. 664], the Court explained that the central concern of the recently ratified Fourteenth Amendment was to put an end to governmental discrimination on account of race. [Citation.] Exclusion of black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure.
>
> * * *
>
> Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. [Citation.] A person's race simply 'is unrelated to his fitness as a juror.' [Citation.] As long ago as *Strauder*, therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror. [Citations.]
>
> The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson v. Kentucky* (1986), 476 U.S. 79, 85-87, 90 L. Ed. 2d 69, 80-81, 106 S. Ct. 1712, 1716-18.

A prosecutor's exercise of peremptory challenges to purposefully and systematically exclude women from jury service simply because of their sex also violates the defendant's right to equal protection of the laws under article I, section 2, of the Illinois Constitution and violates

the defendant's right to an impartial jury of a fair representative cross-section "of the county in which the offense is alleged to have been committed," as guaranteed under article I, section 8, of the Illinois Constitution. The time is long overdue for the total and absolute elimination of all vestiges of sexual and racial discrimination in the courtrooms of America by government officials and no circumlocution can justify or defend it. It is deplorable that in 1987, the bicentennial celebration year of our nation's Constitution, women can be and are being excluded from jury service simply because of their sex.

Under the holding of the majority in the case at bar, in a criminal case in which the defendant is a white female the equal protection clause prohibits the prosecutor from exercising his peremptory challenges to systematically exclude from jury service white or black females simply because of their sex, or white males simply because of their race; but neither the equal protection clause nor the sixth amendment right to a jury prohibits the prosecutor from using his peremptory challenges to systematically exclude black males from jury service simply because of their race or sex. Concomitantly, under the majority's holding, in the case of a white male criminal defendant the equal protection clause prohibits the prosecutor's use of his peremptory challenges to systematically exclude from jury service white and black males simply because of their sex or exclude white females simply because of their race; yet, neither the equal protection clause nor the sixth amendment right to trial by jury precludes the prosecutor from excluding black females from jury service because of their race or sex. Likewise, under the majority's holding a black male criminal defendant has standing to object to the exclusion of black males, black females and white males because of their race or sex under his equal protection right, but the black male criminal defendant lacks standing under the equal protection clause, as well as under the sixth amendment right to trial by jury, to object to the prosecutors' systematic exclusion from jury service white females because of their race or sex. A male criminal defendant, under the majority's holding, has standing to object to the prosecutor's systematic exclusion of all members of his race and all males from jury service simply because of their race or sex but he lacks standing to object to the exclusion of females who are not of his race. Moreover, under the majority's holding in the case at bar, a female criminal defendant has standing to object to the systematic exclusion of any member of her race and any female because of race or sex but she lacks standing to object to the exclusion of males who are not of her race even though their exclusion is based solely on their race or sex. The vast variety of contradictory circum-

stances in the petit jury selection process permitted and prohibited by the majority's holding in the case at bar magnifies the flaws of the holding. Such an imbroglio in my judgment is intolerable and should not exist. That the State is constitutionally prohibited from discriminating against women because of their sex in the jury venire selection process is clearly established. The majority's holding in the case at bar that the State is not likewise constitutionally prohibited, but indeed is authorized to discriminate against women simply because of their sex from the petit jury chosen to try the case is specious and unacceptable. The evil of *Swain* flourished for over 21 years before it was eradicated. Hopefully the inequities of the systematic exclusion of women from jury service simply because of their sex by the prosecutor's use of peremptory challenges under the majority's holding in the case at bar will not as long survive.

For the reasons stated, the defendant's judgment of conviction should be reversed and the cause should be remanded for a new trial by a constitutionally selected jury of a fair cross-section of the community from which the prosecutor has not by peremptory challenges excluded women simply because of their sex.